# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON  DIVISION

## NO.  4:08-MC - 484

---

**ARTHUR BROWN, JR.,**
>TDCJ # 999110, TDCJ Polunsky Unit,
>Livingston, Texas,
>>PETITIONER

**v.**

**NATHANIEL QUARTERMAN,**
>Director, Texas Department of Criminal Justice -
>Institutional Division,
>>RESPONDENT

---

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

---

1.  Name and location of Court which entered the judgment of conviction under attack _____**351st District Court, Harris County, Texas**_____

2.  Date of judgment of conviction ___**November 22, 1993**_____.

3.  Length of Sentence ___**Death**_____

1

4.  Nature of offense involved (all counts)  **Capital Murder—murder of two or more individuals in the same course of conduct .  Tex. Penal Code Sec. 19.03 (a)(7)(A)**   .

5.  What was your plea?

> A.  Not guilty            **X**
> B.  Guilty               ___
> C.  Nolo contendere      ___

> If you entered a guilty plea to one count or indictment and a not guilty plea to another count or indictment, give details:
> **n/a**

6.  Kind of trial: (Check one)

> a.      Jury          **X**
> b.      Judge Only   ___

7.  Did you testify at the trial?

> Yes  ___   No   **X**

8.  Did you appeal from the judgment of conviction?

> Yes   **X**   No    ___

9.  If you did appeal, answer the following:

> a.      Name of the Court  **Texas Court of Criminal Appeals -  Austin, Texas**   .

2

     b.     Result  **conviction and sentence were affirmed in unpublished**

          **decision, *Brown v. State*, 71, 817 (Tex.Crim.App. December 18,**

          **1996)** .

     c.     Date of Result  **December 18, 1996**      .

10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

     Yes  **X**    No **  **

11.  If your answer to 10 was "yes," give the following information:

     a. (1)     Name of Court  **Texas Court of Criminal Appeals / 351st**

             **District Court of Harris County, Texas**

       (2)     Nature of Proceeding  **Application for Writ of Habeas**

          **Corpus pursuant to Texas Code of Criminal Procedure**

          **Art. 11.071**      .

      (3)  Grounds Raised:

        (A)     Ground for Relief Number One:

            **Article 11.071, Texas Code of Criminal Procedure, has been Applied Unconstitutionally Against Applicant by Denying Him the Opportunity to Fully and Fairly Litigate Claims for Relief Because Applicant was Denied Adequate Investigative Resources to Investigate Potentially Meritorious Claims for Relief Which Exist Outside the Record.**

(B)     Ground for Relief Number Two:

**Article 11.071, Texas Code of Criminal Procedure, has been Applied Unconstitutionally in Violation of the 5th, 6th, and 14th Amendments to the United States Constitution Against Applicant by Denying Him Due Process, Effective Assistance of Counsel, and an Impartial Tribunal in the Court of Criminal Appeals.**

( C )   Ground for Relief Number Three:

**Applicant's Conviction and Death Sentence Are Unconstitutional and Violate the Due Process Clause of the 5th and 14th Amendment and the Right to Counsel Clause of the 6th Amendment to the United States Constitution Because Applicant Received Ineffective Assistance of Counsel at Trial Resulting from Trial Counsel's Failure to Adequately Investigate and Present Mitigating Evidence of Applicant's Childhood and Family Circumstances, Other Aspects of his Background and Character, and the Circumstances of the Offense, Which, if Presented, Might have Provided a Basis for the Jury to Return a Sentence of Less Than Death.**

(D)     Ground for Relief Number Four:

**Applicant's Conviction and Death Sentence Violate the Due Process Clause of the 5th and 14th Amendments, the Equal Protection Clause of the 14th Amendment, the right to a fair and impartial jury under the 6th Amendment, and the Prohibition Against Cruel and Unusual Punishments Under the 8th Amendment to the United States Constitution Because the Trial Court's Refusal to Allow Questioning During Voir Dire About Parole Eligibility Effectively Prevented him from Determining how to Exercise Challenges for Cause and Preemptory Strikes Because he was Limited in Finding**

**Bias or Prejudice Against his Primary Defensive Strategy at Punishment.**

(E)    Ground for Relief Number Five:

**Applicant's Conviction and Death Sentence Violate the Due Process Clause of the 5th and 14th Amendments and the Prohibition Against Cruel and Unusual Punishments Under the 8th Amendment to the United States Constitution Because the Trial Court Unconstitutionally Limited the Presentation of Crucial Defensive Evidence Concerning his Statutorily Minimum Period of Incarceration under the then Effective Parole Eligibility Statute and how this Evidence Related to his Defensive Theory.**

(F)    Ground for Relief Number Six:

**Applicant's Conviction and Death Sentence Violate the Due Process Clause of the 5th and 14th Amendments, the Equal Protection Clause of the 14th Amendment, the right to a fair and impartial jury under the 6th Amendment, and the Prohibition Against Cruel and Unusual Punishments Under the 8th Amendment to the United States Constitution Because the Failure to Instruct the Jury About Parole Eligibility Effectively Precluded the Jury from Considering and Giving Effect to Crucial Mitigation Evidence Prompting for a Sentence of Life Imprisonment Rather than Death.**

(G)    Ground for Relief Number Seven:

**Applicant Has Been Denied the Right to Due Process and the Right to the Effective Assistance of Counsel Under the 5th, 6th, and 14th Amendments to the United States Constitution Because the Trial Court and the Texas Court of Criminal Appeals Denied Him Access to Material Evidence in the Exclusive Possession of the**

5

**State That May Support a Meritorious Claim for Review.**

(H)     Ground for Relief Number Eight:

**Applicant Has Been Denied the right to Due Process Under the 5th and 14th Amendments to the United States Constitution Because the State Knowingly Presented Material and False Testimony by Officer C.E. Anderson Regarding the Match Between Firearms and Bullet Slugs Conducted by the Houston Police Department.**

(I)     Ground for Relief Number Nine:

**Applicant's Conviction and Death Sentence Violate the Due Process Clause of the 14th Amendment to the United States Constitution Because the State and the Trial Court Coerced Witness Carolyn Momoh to Make False Statements Under Oath and Knowingly Presented that Evidence to the Jury.**

(4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes ____     No **X**

(5) Result  **Relief Denied – *Ex parte Arthur Brown, Jr.*, WR 26,178-02 (Tex.Crim.App. June 18, 2008)** .

(6) Date of Result **June 18, 2008** .

b. As to any second petition, application or motion, give the same information:

(1) Name of Court **N/A** .

(2) Nature of Proceeding **N/A** .

6

(3) Grounds Raised:__**N/A**__

  (4) Did you receive an evidentiary hearing on your petition, application or motion?

Yes **___**        No **X**

(5) Result ____**N/A**_____.

(6) Date of Result __**N/A**_____.

  c. As to any third petition, application or motion, give the same information:

(1) Name of Court____**N/A**_____.

(2) Nature of Proceeding ____**N/A**_____.

(3) Grounds Raised:__**N/A**_____.

  (4)  Did you receive an evidentiary hearing on your petition, application or motion?

Yes **N/A**___        No ____

(5) Result __**N/A**_____

(6) Date of Result __**N/A**_____.

  d.    Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition, etc.        Yes **X**     No ___

(2) Second petition etc.        Yes ___     No ___

(3) Third petition etc.        Yes ___     No ___

7

e.  If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____ .

12.  State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you may attach pages stating additional grounds and *facts* supporting same.

The present case follows from a 1992 capital murder in Houston, Texas, in which six individuals were tied up in a residence and shot.  Two individuals, Rachel Tovar and Alexander Camarillo, also known as Nicolas Cortez, survived and testified at trial.

The State prosecuted Petitioner, Arthur Brown, Jr., under the theory that he and and one of his accomplices, Marion Dudley, committed the murders while a third accomplice, Antonio Dunson, remained in the vehicle outside.  The evidence at trial showed that the owners of the residence, Jose and Rachel Tovar were drug dealers, supplying both marijuana and cocaine to other individuals in the drug trade.  The Tovars supplied drugs to Petitioner and his associates, who traveled from Tuscaloosa, Alabama, to Houston to obtain the drugs, as well as to unrelated individuals, including rival drug dealer to Petitioner and his associates in Tuscaloosa.

During trial, the defense presented a counter theory that while Petitioner and his associates had purchased drugs from the Tovars on earlier occasions, the murders were committed either by rival drug dealers from Tuscaloosa, or by an unknown individual

8

who had a motive to kill one of the decedents, Frank Farias, in order to prevent him from testifying in an upcoming trial. The State recovered no forensic evidence, such as DNA or fingerprints at the scene of the offense. Nor were the alleged murder weapons recovered from Petitioner or his associates. One weapon was found near the body of an individual killed in Tuscaloosa, while another weapon was located in a police property room, having been seized from an individual having no direct connection with Petitioner.

At the punishment phase of trial, the defense presented no evidence directly relating to Petitioner's character or personality, but instead, presented testimony by a single individual regarding the phenomena of maturational reform. According to this theory, individuals, particularly when incarcerated, tend to become less physically aggressive as they age, regardless of whether they receive treatment for their aggressive tendencies.

The Honorable Lupe Salinas presided over Petitioner's trial. At the time of the investigation and filing of the post-conviction writ, a different judge, the Honorable Mark Ellis, presided over the state habeas court.

### A.    GROUND FOR REVIEW NUMBER ONE:

**PETITIONER HAS BEEN DEPRIVED OF THE FULL AND FAIR OPPORTUNITY TO INVESTIGATE, DEVELOP AND EXHAUST POTENTIAL CLAIMS IN STATE COURT DUE TO UNREASONABLE AND ARBITRARY LIMITATIONS IN INVESTIGATIVE RESOURCES**

9

IMPOSED BY THE TEXAS COURT OF CRIMINAL APPEALS, WHICH REQUIRED PETITIONER TO PREMATURELY CURTAIL HIS POST-CONVICTION INVESTIGATION IN THIS CASE.

**B**.    **GROUND FOR REVIEW NUMBER TWO**:

AS A RESULT OF THE ARBITRARY AND UNREASONABLE LIMITATIONS UPON INVESTIGATION IMPOSED ON PETITIONER BY THE TEXAS COURT OF CRIMINAL APPEALS DUE TO ITS INADEQUATE FUNDING OF THE POST-CONVICTION FACTUAL INVESTIGATION UNDER TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 11.071, PETITIONER HAS BEEN DENIED HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL, AND TO AN IMPARTIAL TRIBUNAL UNDER THE 5TH, 6TH, AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

**Factual Summary**

1.    Although the full costs of Petitioner's trial are unknown, at the time of trial, it was one of the most costly capital murder trials in Harris County history.  A newspaper account by the Tuscaloosa News (Petitioner's home town newspaper) reported that the costs of trial for the voir dire and the first eight days of testimony exceeded $366,000.  Wendy Reeves, Cost of Conducting Trial in Texas Killings Soaring, The Tuscaloosa News at 12A, November 14, 2003.  The costs involved in the investigation by federal and state law enforcement officials in Texas and Alabama is unknown to Petitioner.

2.    In 1995, the Texas Legislature amended Article 11.07, of the Texas Code of Criminal Procedure, creating a new section, Article 11.071, which enacted

10

procedures specifically relating to the litigation of post-conviction writs of habeas corpus from capital convictions resulting in a death sentence. *See*, Acts 1995, 74th Leg., ch. 319, § 1, eff. Sept. 1, 1995. The new section provided for the appointment of counsel, creating the state statutory right to post-conviction counsel in capital cases, imposed the obligation of post-conviction counsel to investigate the factual and legal bases of the capital conviction, created funding requirements for reasonable and necessary expenses incurred in post-conviction litigation, and expressly codified a standard to limit the filing of "successive" post-conviction writs.

3.      At the time of the appointment of state post-conviction counsel, the Texas Court of Criminal Appeals administered Article 11.071, both with respect to appointment of counsel and for funding matters for counsel, experts, and other investigation and litigation costs. Until the Texas Legislature subsequently amended the statute, which occurred after the state post-conviction writ application in this case, the Court of Criminal Appeals possessed complete jurisdiction for appointment of counsel and for review and approval or denial of funding requests for all fees and expenses. Tex.Code Crim.Pro. Article 11.071, Sec. 2(h), Sec 3(b) - (e) (1996) .

4.      The Court of Criminal Appeals received funding for Article 11.071 expenses on a biennial basis from the Texas Legislature following a budgetary projection and request for appropriation by the Court. For the 1997 fiscal year, the

Court received $2,000,000 from the Texas Legislature for administration post-conviction death penalty cases under Article 11.071.

5.     Following the implementation of Article 11.071, the Court of Criminal Appeals experienced cost overruns regarding the payment of attorneys fees and expenses, investigator fees and expenses, and expert fees and expenses.  As a result of these overruns, the Court resorted to seeking, and receiving, discretionary funds from the Texas Governor's Office for the 1996 biennium in the amount of $700,000.

6.     As part of the negotiations for these discretionary funds, the Governor's Office instructed the court to control its expenditures in its administration of post-conviction cases.  The implication of this was that no more interim or emergency funding would be forthcoming in the event of cost overruns.

7.     As of February 1998, while the investigation of Petitioner's state post-conviction writ was still underway, the Court of Criminal Appeals received $4,000,000 for the 1998 biennium and had paid approximately $ 800,000 in claims.

8.     Petitioner initially sought and received up front  $2,500 from the Court of Criminal Appeals for the investigation of this case.  At a rate of compensation of $50.00 hour, which was the industry standard among private investigators and mitigation investigators across the State of Texas at that time, this amount would only

permit a little over one full work week–50 hours–of investigation.  The investigator also had to pay all costs, particularly travel costs, from this amount as well.

9.      Petitioner retained a licenced private investigator and mitigation specialist, Lisa Milstein, to conduct an investigation into  potential  guilt-innocence and punishment phase issues in the case.  Given the circumstances of the case, the investigation necessitated locating and interviewing witnesses and physical evidence throughout Houston, Texas, and Tuscaloosa, Alabama.  *See,* Exhibit A: *Applicant's Ex Parte Motion for Pre-Payment of Investigator's Fees*.

10.      During the course of the investigation, Milstein located and interviewed witnesses in Houston, including Rachel Tovar, and traveled by air to Tuscaloosa, Alabama, for the purpose of locating and interviewing members of Applicant's family, which was comprised of 32 full and half-siblings, his mother and father (who were divorced), and Petitioner's other acquaintances and friends, such as trial witnesses Malik Travis, LaTonya Hill, and Monica Dotson.   *See*, Exhibit B: *Applicant's Ex Parte Motion to Permit Out-of-State Travel by Investigator to Interview Witnesses*. Milstein located only a handful of potential witnesses, and she was able to conduct some  initial  interviews  with  them.   From  these  interviews,  she  was  able  to  piece together important factual support indicating that Petitioner's constitutional rights had been violated, particularly his constitutional right to effective assistance of counsel at

punishment.  However, in this single trip to Alabama, she was not able to locate and meet with all of the identified witnesses, discover whether additional witnesses existed, locate and obtain documentary evidence, and obtain affidavits from the people she had interviewed.  In other words, she only began her investigation with this trip, and she required extensive follow-up, which is typical of an investigation of this sort.

11.     The costs of the investigation in both Houston and Tuscaloosa, including both time and reimbursable expenses, exceeded the pre-authorized funds by $292.34.

12.     In order to continue the investigation of possible issues and to develop information previously obtained, Petitioner requested additional funding from the Court of Criminal Appeals in the amount of $2,500 for additional investigation, and $292.34 as reimbursement for the investigator's time and expenses.   *See*, Exhibit C: *Applicant's Second Ex Parte Motion for Pre-Payment of Investigator's Expenses*.  The funding motion was supported by a detailed memorandum from Milstein of the witnesses who had been contacted, what had been discovered, an explanation of the investigation that remained to be done, and an estimate of the additional time and expenses required to complete the investigation.

13.     The Texas Court of Criminal Appeals took limited action upon Petitioner's second funding request, granting the $292.34 to reimburse the investigator for her overruns, but otherwise denying Petitioner's request for additional funds to

continue the investigation.   Article 11.071, § 3(d), required the court to provide a written explanation for the denial of requested funding, ostensibly to afford a Petitioner the opportunity to remedy any deficiencies in the funding request.  The court did not do so, however, leaving Petitioner without a basis to determine, and if necessary, to remedy, the reason for the denial.

14.    In light of the curtailed funding for continued investigation, the factual investigation of Petitioner's case effectively ceased upon Milstein's return from Tuscaloosa.  Because of the lack of funding, Petitioner was unable to continue the required investigation or to collect and develop additional evidence in the form of witness interviews, declarations, affidavits, and family or government records.   As a substitute for witness statements and evidence, Petitioner submitted the Milstein's affidavit as a "proffer" of the witness testimony that he expected to develop with a reasonable investigation.  *See*, Exhibit D: *Statement of Lisa Milstein (State Post Conviction Writ Exhibit C)*.

15.    Petitioner timely submitted his state post-conviction writ of habeas corpus in the 351st District Court of Harris County, Texas, on March 26, 1998.  As part of this writ application, Petitioner requested as relief that the trial court hold an evidentiary hearing on the allegations and allow the investigation to proceed after providing funding.

16.     The State filed an answer to the post-conviction writ four years later, on April 24, 2002.

17.     On May 11, 2006, the state habeas court issued an order to the parties to prepare and file Proposed Findings of Fact and Conclusions of Law.

18.     On July 3, 2006, along with his proposed findings of fact, Petitioner filed an *Objection to Inadequate Fact-Finding Procedures and Request for Evidentiary Hearing* in which he objected to the resolution of Petitioner's claims without a live evidentiary hearing and additional discovery.  As part of the relief sought, Petitioner specifically requested that the state habeas court:

> . . .
>
> (2)     Set the case for a scheduling hearing to determine the date for a live evidentiary hearing and for presentation of essential discovery matters;
>
> (3)     Re-consider and grant Applicant's previously filed motion to permit forensic testing necessary to resolve the ballistics issue;
>
> (4)     Order discovery of the State's files relating to written/recorded statements by witness Carolyn Momoh made to law enforcement officers and or prosecutorial personnel in relation to her participation as a witness in this case, or defendant in the subsequent prosecution against her, as well as any statements made by Applicant's other siblings who were contemporaneously interrogated by law enforcement during the investigation of this case, or any other information which would be relevant

16

consistent with the State's heightened due process requirements, *see e.g.*, ***Banks v. Dretke***, 540 U.S. 668 (2004);

(5) Grant such funding requests as to permit Applicant to investigate, evaluate, and meaningfully present mitigation evidence in post-conviction proceedings consistent with the requirements of ***Wiggins v. Smith***, 539 U.S. 510 (2003); *and*, ***Williams v. Taylor***, 529 U.S. 362 (2000).

19. The state habeas court took no action on Petitioner's Objections and request for an evidentiary hearing. The state habeas court declined to sign the motion either granting or denying the requested relief.

20. On August 31, 2007, a full year following submission of the Objections and Proposed Fact-Findings, the state habeas court signed without modification the State's proposed findings of fact and conclusions of law and recommended that relief be denied. As part of these fact findings and conclusions of law, the court held that Petitioner's claims were not cognizable under Texas law and that, therefore, there was no need to address them. The court found that Milstein's affidavit did not present "evidence" in support of any claim because it was based upon hearsay. Finally, the court found that Petitioner failed to show harm from the denial of additional investigative funds.

21. The Court of Criminal Appeals adopted the state habeas court's recommendations verbatim by way of a standard order. *Ex parte Arthur Brown, Jr.,*

WR-26-178-02 <u>Order</u>, (Tex.Crim.App., June 18, 2008).  The Court noted that a hearing was not held, *id*. at 2, but did not address the funding issues, or Petitioner's renewed request to the state habeas court for funding, discovery, and the opportunity to factually develop his claims.

**Legal Basis of Claim**

The Due Process Clause of the 14th Amendment, and the Supremacy Clause of the United States Constitution require the provision of adequate procedures for post-conviction review of claims regarding the deprivation of federally guaranteed rights in state criminal proceedings. *Case v. Nebraska*, 381 U.S. 336, 345 (1965) (Brennan, J., concurring); *Young v. Ragen*, 337 U.S. 235, 239 (1949); *Wolff v. McDonald*, 418 U.S. 539, 579 (1974) ("Due Process...assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."); *Bounds v. Smith*, 430 U.S. 817 (1977).  In permitting post-conviction relief,  it is incumbent upon the State to afford a petitioner the opportunity to fully and fairly litigate his claims for relief.  *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).  *See also Townsend v. Sain*, 372 U.S. 293, 312-313 (1963) (overruled on other grounds by *Keeney*).  The opportunity to fully litigate federal claims at the state level is particularly important in the context of capital cases because  "[s]tate habeas corpus proceedings are a vital link in the capital review

process, not the least because all federal habeas claims first must be adequately raised in state court." *McFarland v. Scott*, 512 U.S. 1256, 1261 (1994) (Blackmun, J., dissenting to denial of *certiorari*).

A petitioner may be unfairly deprived of the opportunity to fully and fairly litigate his claims for relief, and therefore, state post-conviction procedures may be constitutionally inadequate where "appointed counsel and public funds for experts, witnesses, and investigators are not available to enable indigent prisoners to make a meaningful case for postconviction relief." *See*, 1 RANDY HERTZ, ET AL., FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE, § 7.1b (5th ed. 2005). *See also McFarland*, 512 U.S. at 1261-64 (Blackmun, J., dissenting). *Cf. Townsend*, 372 U.S. at 313 (state habeas proceedings are not entitled to factual deference by federal courts if "the fact-finding procedure employed by the state court was not adequate to afford full and fair hearing" and "the material facts were not adequately developed at the state-court hearing ... .").

The Supreme Court has recognized that the opportunity to fully and fairly litigate a federal claim is inextricably tied to the provision of adequate funding, not simply for attorneys, but for collateral resources, such as investigators and experts, which are necessary to support the claim for relief. *McFarland v. Scott*, 512 U.S. at 855.

*Substantive Due Process*.  The state habeas court's refusal to provide additional investigation fees violated Petitioner's right to substantive due process under the 14th Amendment to the United States Constitution.   Substantive due process equates with fundamental fairness in the exercise of a right.[1]  Petitioner has the right to seek relief through a writ of habeas corpus under both the Federal and Texas Constitutions.  U.S. CONST. Art. I, §9; TEX.CONST. Art. I, § 12.  Article 11.071 creates the manner and means in which indigent capital defendants are be provided counsel in which to challenge the legality of their convictions and sentences.  But by refusing to provide adequate investigative resources to develop factual non-record claims, the Court of Criminal Appeals essentially abrogated the right to seek post-conviction habeas relief. The "right" to seek habeas relief essentially becomes form without substance.

The state court's provision of investigative funds in the instant case were inadequate to investigate and develop factual claims relating to potential deprivations of Petitioner's federal constitutional rights.  Furthermore, court's denial of additional investigative funds was not based upon Petitioner's failure to show the need for such

---

[1]  Although there is no absolute constitutional right to the creation of the system set out by Art. 11.071, "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause."  *Evitts v. Lucey*, 469 U.S. 387, 401 (1985).  When a statutory scheme gives rise to a substantial and legitimate expectation that deprivations will result only from compliance with the scheme, enforceable due process rights are created.  *See Meachum v. Fano*, 427 U.S. 215, 226 (1976); *Hewitt v. Helms*, 459 U.S. 460 (1983); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

funds.  Petitioner was effectively deprived of his right to seek habeas review under the 14th Amendment to the United States Constitution.

*Procedural Due Process and Meaningful Access to Courts*.  The state habeas court's refusal to provide additional investigation fees also violated Petitioner's right to procedural due process in the form of denying him meaningful access to the courts to challenge his conviction and death sentence.  The requirement of fundamental fairness in a criminal proceeding, as contained within the Due Process Clause applies to rights exclusively conferred by state statute.  *See,  Douglas v. California*, 372 U.S. 353, 357-358 (1963) (right to appeal); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (parole revocation proceedings).  *See also*, *Meachum v. Fano*, 427 U.S. 215, 226 (1976);  *Hewitt v. Helms*, 459 U.S. 460 (1983); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (sentence within appropriate range for offense).

The right of access to the courts, as contained within the right to procedural due process, requires the opportunity to present grievances to the courts.  "The right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."  *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974).  But due process requires more than mere access to the court; access to the courts must be *meaningful*.  *Bounds v. Smith*, 430 U.S. 817, 821-822 (1977).

21

"Meaningful access" contemplates being able to effectively present one's case.  *See*, ***Armstrong v. Manzo***, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is 'the opportunity to be heard.' ... It is an opportunity which must be granted at a meaningful time and in a meaningful manner.").  Further, the right to meaningful access to the courts extends to prisoners collaterally attacking their convictions.  *See, e.g.*, ***Bounds***, *supra*.  Thus, where the right to an attorney to assist in investigate and prepare an application for writ of habeas corpus is  provided by law, due process requires the State to provide adequate investigative materials in order for the petitioner to present his claims.  *Cf. **Ake v. Oklahoma***, 470 U.S. 68, 76- 77 (1985).

The state habeas court's limitation of investigative funds to $2,729.34 deprived Petitioner the right to meaningfully present his claims.  The cost amount stands in sharp contrast to the costs incurred in trying the case.  When factoring in investigative expenses, the Court permitted less than 50 hours of time to investigate the case. Petitioner exhausted the initial investigative funds in the course of the factual investigation of this case.  At the time he requested additional investigative funds from the Court of Criminal Appeals, the investigation of this case was still ongoing.  The investigation of the case revealed potential grounds which could form the basis for one or more claims that Petitioner had suffered violations of his federal constitutional rights, including his right not to be convicted on the basis of false testimony and his

right to the effective assistance of counsel through the investigation and presentation of mitigating evidence.

In requesting additional funds, Petitioner provided to the state habeas court with an accounting of the investigation, stating how the initial funds had been spent, what areas required additional investigation, and providing an estimate of the time and expenses necessary to complete the investigation. The state court denied Applicant's request without written explanation. As a result, Petitioner was unable to substantiate and clarify facts, or to further investigate facts that might support his claims. This refusal to provide additional investigative funds denied Petitioner the opportunity to meaningfully participate in the state post-conviction process. In addition, Petitioner was precluded from investigating any new grounds.

Consequently, Petitioner was denied procedural due process by denying him additional and adequate funds with which to conduct the investigation of this case and subsequently present his case in state court.

*Equal Protection*. The denial of additional investigation fees violated Petitioner's right to Equal Protection under the 14th Amendment to the United States Constitution. Specifically, the state court's grant of only $2,792.34 in total investigative fees and expenses denied him equal protection of the law with regard to similarly situated habeas petitioners under the Texas post-conviction process who

have sought and received investigative expenses exceeding this sum.  The state court's rationale for denying additional investigative funds was based solely upon the court's budgetary considerations, rather than Petitioner's demonstrated need for additional investigation, and, therefore, it was not justified under either strict scrutiny review or even under the more lenient rational basis review.

The right to Equal Protection essentially means that similarly situated persons must be treated in an equal manner.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  The right to Equal Protection is violated when similarly situated persons are treated differently for which there is no legitimate basis.  *See Cleburne Living Center*, 473 U.S. at 439.

The right to adequate investigative fees is correlative to the right to meaningful access to the courts.  *See generally Ake v. Oklahoma*, 470 U.S. at 76-77.  The right to meaningful access to the courts is a fundamental right, *Bounds*, 430 U.S. at 821-822, and therefore, any infringements upon that right is subject to "strict scrutiny" review, *e.g.*, the limitation must be based upon a compelling government need.  *See Sotto v. Wainwright*, 601 F.2d 184, 190 (5th Cir. 1979); *Taylor v. Sterrett*, 532 F.2d 462, 472 (5th Cir. 1976).  *Cf. Ake*, 470 U.S. at 78-79 (describing State's interest in denying psychological expert due to financial burden as not "substantial").  Therefore, because the allocation of investigative fees has a direct bearing on a Petitioner's right

24

to meaningfully access the courts, the decision to deny additional investigative fees is subject to a strict scrutiny.

The Texas Court of Criminal Appeals maintains written records of investigative fees and expenses pertaining to appointments under Article 11.071.  In accordance with the Texas Open Records Act, Petitioner requested the Court release to him with information regarding the total amounts requested for investigative fees and expenses of Article 11.071 petitioners up to February 17, 1998.  In a letter to counsel, however, the Court denied the request on the ground that the Court was not subject to the Texas Open Records Act and declined to produce the requested records. Petitioner plead this information, and included the correspondence to and from the Court of Criminal Appeals within his state post-conviction writ application.  He was, however, precluded from producing  evidence at the time of the filing of this writ in support of his claim.

Petitioner believes, however, that should such records be subject to disclosure through discovery as allowed by the Habeas Rules, he would be able to show the following:

(1)     the Texas Court of Criminal Appeals had made the time of a hearing hundreds of appointments under Art. 11.071;

(2)     the Court had  allocated investigative fees to these other petitioners;

(3)     the total amount of investigative fees in some of these cases had exceeded the $2,792.34 allocated to Petitioner;

25

(4)     the Court's decision to deny Petitioner additional investigative resources was unrelated to the merits of his request; and

(5)     the Court's decision to deny Petitioner additional investigative funds was made with its focus on budgetary concerns, *e.g.,* upon the Court's concern in avoiding overspending the funds allocated to the Court to administer Art. 11.071 appointments under the current biennium.

The state court's reasons for denying additional investigative resources did not justify the denial of those funds. Where a showing of need for additional funds has been demonstrated, the state court's interest in preserving its budget, and in order to avoid cost-overruns, is not a sufficiently compelling reason to deny investigative funding, in light of the effect upon a habeas petitioner's meaningful access to the courts. *See*, ***Ake v. Oklahoma***, 470 U.S. at 76-77 (where a defendant has demonstrated the need for a psychological expert, "the State's interest in its fisc must yield"); ***Bounds***, 430 U.S. at 825 ("cost of protecting a constitutional right cannot justify its total denial"); ***Smith v. Bennett***, 365 U.S. 708, 713 (1961) ("Financial hurdles must not be permitted to condition its [the writ of habeas corpus'] exercise").

In the alternative, if it is held that the state habeas court's decision to deny additional and reasonable investigative expenses are subject to the more deferential rational basis review, the limitation of additional investigative fees was not rationally related to a legitimate government interest. That is, the decision to allocate investigative fees based upon the court's interest in balancing the capital post-

conviction budget was not rationally related to the statute's end of promoting the finality of capital judgments by permitting petitioners in capital cases to adequately investigate their cases and present within one application, all cognizable grounds for relief.

Petitioner was denied his right to equal protection through the administration of the state post-conviction procedures applied in his case.

*Effective Assistance of Habeas Counsel.*  Finally, Petitioner was denied the effective assistance of counsel under the 6th and 14th Amendments to the United States Constitution.  Specifically, the denial of additional investigative fees curtailed adequate factual investigation in this case, precluding state habeas counsel from rendering effective assistance by researching and raising all possible meritorious cognizable claims.

The right to the effective assistance of counsel attaches to representation on post-conviction writs of habeas corpus through the creation of a statutory right to counsel.  *See, Evitts v. Lucey*, 469 U.S. 387, 396 (1985) (Where right to counsel on appeal created under statute, Due Process guarantees right to effective counsel).  The right to the effective assistance of counsel at both trial and habeas presupposes a thorough factual investigation of the case.  *Bounds*, 430 U.S. at 825 ("It would verge on incompetence for a lawyer to file an initial pleading without researching ... [the]

27

types of relief available.  Most importantly, of course, a lawyer must ... determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action."); ***Rummel v. Estelle***, 590 F.2d 103, 104 (5th Cir. 1979).

The denial of sufficient investigative funds in the case at bar denied Petitioner the right to effective assistance of counsel, where the right to counsel has been established by legislative enactment, because in funding limitation has curtailed investigation which would substantiate potential grounds for relief, as well as possibly uncover new grounds for relief.  The investigation in this case was still ongoing when the investigative fees  pre-authorized by the state court were exhausted.  Petitioner's investigator uncovered several possible grounds for relief that required additional interviews with both prior witnesses, as well as interviews with new witnesses. Although the State of Texas has enacted the right to counsel in capital post-conviction proceedings, charged counsel with the obligation to "investigate expeditiously" the "factual and legal grounds for the filing of an application for a writ of habeas corpus," TEX. CRIM. P. CODE ANN. art. 11.071, § 3(a), and expressly enacted abuse of the writ provisions for the failure to include issues within the writ, *see **id***. § 5, the limitations in funding have prevented counsel from fulfilling the obligation created through appointment.

C.    **GROUND FOR REVIEW NUMBER THREE**:

APPLICANT'S CONVICTION AND DEATH SENTENCE ARE UNCONSTITUTIONAL AND VIOLATE THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS AND THE RIGHT TO COUNSEL CLAUSE OF THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE APPLICANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL RESULTING FROM TRIAL COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATING EVIDENCE OF APPLICANT'S CHILDHOOD AND FAMILY CIRCUMSTANCES, OTHER ASPECTS OF HIS BACKGROUND AND CHARACTER, AND THE CIRCUMSTANCES OF THE OFFENSE, WHICH, IF PRESENTED, MIGHT HAVE PROVIDED A BASIS FOR THE JURY TO RETURN A SENTENCE OF LESS THAN DEATH.

**Factual Summary**

1.    The State presented a pared down case during its punishment phase.  In addition to the murders themselves, Petitioner's alleged flight to avoid apprehension, and Petitioner's activities in selling narcotics in the Tuscaloosa area, the State presented  evidence that Petitioner had been convicted in 1990 of armed robbery in Alabama.  The State also presented testimony by a single inmate, Matthew Sklar,  who alleged that Petitioner was part of a small group of inmates that extorted  money from him and other inmates in the Harris County Jail.  Two Harris County jailers, Carlos Lopez and Henry Mitchell, testified that Petitioner had come to blows with Mitchell during the investigation of the extortion allegations, and as a result of this, he was moved to more secure housing.

2.     At the time of trial, Petitioner had filed  a *pro se* Section 1983 lawsuit in the Southern District of Texas  against Harris County jailers Henry Mitchell, Carlos Lopez, and FNU Morrison relating to injuries he had received from being beaten by them during the alleged incident with Mitchell.  Defense counsel cross-examined Lopez and Mitchell about their status as defendants in Petitioner's civil rights lawsuit.

3.     As its own punishment case, the defense  presented testimony by a single witness, Dr.  Peter Lewis, a criminologist and law professor at South Texas College of Law,  regarding the concept of maturational reform.  As explained by Dr. Lewis, maturational reform was a phenomena finding that as individuals age, their propensity for violence  correspondently decreases.  The phenomena holds true regardless of whether the individual receives any "treatment" for aggressiveness.  However, placing the individual in a structured environment, such as prison, heightens the effect.

4.     The defense also entered into evidence Petitioner's school records as Defense Exhibit 132, which reflected that Petitioner had been a poor student, was placed in special education classes, and had a below average IQ.  The defense did not present any testimony or other explanation for the significance of the  records, and defense counsel's closing arguments concerning the school records was cursory at best.  The State, on the other hand, argued that a low IQ did not show that Petitioner did not recognize the difference between right and wrong, which Petitioner's defense

team did not counter at any point.  As a result, the jury was left to speculate freely concerning what other manner poor school performance affected Petitioner's character and background and how it showed he had a reduced moral culpability in general and as related to this crime.

5.      During the guilt-innocence phase, the jury heard that Petitioner had a large number of full and half-siblings–thirty-three according to Petitioner's sister, Serisa Brown–and that he had a common law wife or girlfriend, Aneitha Gay, and that they had three children together, SaDonah, A.J., and Josh.  Other than this, the jury was exposed to no other facts regarding Petitioner's character or background.

6.      Following Professor Lewis's testimony, Petitioner requested on the record, but outside the jury's presence, that his mother not be called as a witness because he wanted to spare her the ordeal.  The trial court confirmed that this was Petitioner's decision.  Importantly, nowhere in the record did Petitioner assert that he did not want to present any mitigation evidence whatsoever.  Instead, the only mitigation that he wanted to forego was from his mother.

7.      The defense did not make use of an investigator or mitigation specialist to undertake an investigation of the case or Petitioner's background or character.  Furthermore, the defense did not use any experts, such as doctors, psychologists, or the like, to assist in developing a mitigation case, and it is apparent that they did not

request such expert assistance.  Finally, the evidence in the record that the defense team did much of anything to investigate mitigation is scant at best.

8.     In response to Petitioner's allegations within the state post-conviction writ, lead trial counsel, Patricia Nasworthy Saum,[2] submitted an affidavit apparently to rebut the allegations in Petitioner's state writ application.  She stated that she met with Petitioner, and during this meeting, she handed him a legal pad and instructed him to write down everything he knew about his past.  He evidently filled up 14 single-spaced pages with information.  However, because this was work product, Saum declined to reveal what she learned that could be considered mitigation evidence and whether through Petitioner's hand written story, she learned all or substantially all the mitigation facts contained in the writ application.  She also stated that she traveled to Tuscaloosa and met with Petitioner's mother.  However, Saum's affidavit does not discuss the extent of her mitigation-focus during her meeting with Petitioner's mother, the length of time she spent with her, or the issues she discussed. Saum asserted that she met with other members of Petitioner's family, but again, her affidavit is silent concerning whether she discussed mitigation with any of them, and if so, what she learned.

---

[2]     For consistency with the trial record, Saum is referred to in this petition by her married name at the time of trial.

9.     Saum averred, however, that she did formulate a trial strategy with respect to mitigation.  She believed that the facts of the crime were such that no mitigation would overcome them, so she decided to focus on guilt-innocence. Concurring with the State's argument during its summation at trial, she stated that Petitioner's IQ was not significant in determining that Petitioner did not know right from wrong.  Importantly, Saum did not point to any other investigation or expert opinion that would allow her to conclude that Petitioner did not have a diminished capacity to appreciate the wrongfulness of his actions or otherwise to control them. She did not make use of any experts such as psychologists, psychiatrists, neuro psychologists, neurologists, social workers, or the like.   Apparently, from the averments in the affidavit, Saum based her conclusions on what was in the school records alone, but whether she actually based her conclusions on this matter is speculation because the affidavit is silent about it.  Finally, Saum stated that she did not call Petitioner's  sisters to testify, though they were apparently available, because the State had traumatized them during guilt-innocence.  She did not indicate whether she investigated whether they had knowledge of possible mitigation evidence, determined what this mitigation evidence was, and determined whether they would be able to convey it to the jury before making the decision to allow them to refrain from further testimony.  As stated, the affidavit as a whole is silent concerning what

investigative measures Saum took or to the extent she did investigate mitigation, what the results of the investigation was, before formulating a trial strategy.

10.     As part of the state post-conviction investigation of the case, Petitioner, retained the services of a licenced private investigator and mitigation specialist, Lisa Milstein, to investigate, among other issues, the facts and circumstances of Petitioner's family background and personal circumstances.  Milstein made a single trip to Tuscaloosa, Alabama, as part of her investigation and located and interviewed several members of Petitioner's family – his mother, Joe Mae Brown; three sisters, Grace Brown, Serisa Brown and Carolyn Momoh; his father, Arthur Brown, Sr.; and one of his brothers, Johnny Brown.  Ms. Milstein's interviews were not exhaustive and she planned on returning for follow up interviews with these individuals, interviews with other potential witnesses and family members, and preparation of affidavits consistent with the interview results.  However, she was forced to curtail her investigation as a result of the state court's denial of additional investigation funds. With the exception of a single hand written affidavit by Petitioner's mother, Joe Mae Brown, concerning her alcoholism, Milstein did not obtain affidavits from any of the remaining individuals whom she interviewed.   She also was unable to interview the remainder of Petitioner's extensive family, obtain documentation, and follow up on any other leads she had.  In lieu of these affidavits, Milstein submitted her own

affidavit detailing some of the information she learned from the family members. *See*, Exhibit D: *Statement of Lisa Milstein*.

11.     Petitioner's mother, Joe Mae Brown ("Joe Mae"), met with Petitioner's trial attorney prior to trial, but they did not discuss Petitioner's background.  In post-conviction proceedings, Petitioner's mitigation  invetigator learned more comprehensive facts of Petitioner's background and upbringing than presented at trial. Petitioner's father, Arthur Brown, Sr., and Joe Mae were married when Petitioner was born, but divorced when he was 12 years old.  Joe Mae kept custody of Petitioner and three other siblings from the marriage.   The marriage was tumultuous and often violent.  Petitioner's father sometimes beat Joe Mae and would sometimes strike her with a leather belt.  Arthur Brown Sr.'s violence was one of the main reasons Joe Mae separated form him  and eventually obtained a divorce.

12.     Petitioner grew up impoverished, both before and after his parent's divorce.  Following the divorce, Petitioner lived with his mother and three other siblings in a small apartment in a poor district of Tuscaloosa.  The apartment was located ten yards from a railroad track.  The neighborhood contained both narcotics and violence.

13.     According to Joe Mae and other family members, Petitioner was close to his father growing up, and the divorce had a profound effect upon his  behavior.

He started acting out in school, and the family recalled an incident when Petitioner was quite young in which he threatened to kill himself by leaping from a lavatory window at school. With the departure and absence of Petitioner's father from his life, Petitioner lacked a male role model as he matured into adolescence. To compound the situation, with the departure of Petitioner's father, a non-drinker who disapproved of Joe Mae's family and friends, Joe Mae started partying more and would frequently have drinking companions to the house, which exposed Petitioner to their heavy drinking and carousing.

14.    It is common knowledge in Petitioner's family that Joe Mae drank heavily, and was likely an alcoholic. Joe Mae drank with her sisters or other family members on a daily, or near daily basis. One of Petitioner's aunts made moonshine whiskey, and Joe Mae obtained illicit liquor from her. She often went out drinking at night, leaving the children alone at home only to return heavily intoxicated in the early morning. One of Petitioner's sisters reported – and Joe Mae confirmed the truth of this – that Joe Mae would sometimes wake the children up after coming home drunk and make them pray throughout the rest of the evening until the early morning. As result, the children were frequently tired at school. Petitioner was exposed to his mother's profligate drinking and was profoundly embarrassed by her appearance in public while heavily drunk.

15.     Significantly, Joe Mae drank heavily throughout her pregnancy with Petitioner.  Through her handwritten affidavit, Joe Mae admitted to drinking while she was pregnant with Petitioner, at least every weekends and often times during the week.  She estimated that she consumed at least a pint of bootleg whiskey or brandy during her binges.  Milstein noted, based on her education, training, and experience as a mitigation specialist, that the consumption of alcohol during pregnancy may have severely detrimental effects upon pre-natal development.  "Fetal Alcohol Syndrom" (FAS) is a disorder of permanent birth defects caused by the ingestion of alcohol during pregnancy and can include neurological and other brain structure damage with resulting behavioral problems.  "Fetal Alcohol Effect" is a variant of FAS, but lacks the characteristic facial abnormalities associated with FAS.   Despite the absence of physical characteristics associated with FAS, individuals with FAE could have as many or more of the neurological deficits, and resulting behavioral and judgment impairment of those exhibiting FAS.[3]  Milstein's investigation led her to believe that neither defense counsel at trial nor anyone else had ever had Petitioner evaluated by a neuropsychologist to determine the presence of brain damage, either from Joe Mae's

---

[3] A internet derived  article from Wikipedia concerning the current state of general knowledge concerning Fetal Alcohol Syndrome is included as Exhibit E.

pre-natal drinking or from other causes. Milstein was unable to gather additional information in order to provide a basis to seek funding for neuropsychological testing.

16.     Milstein determined from speaking with Joe Mae that additional reasons, apart from her alcohol use, existed to question Petitioner's neuropsychological health. When he was three years old, Petitioner fell out of a swing, striking his head on a cement porch. He was taken to a local hospital, and the attending physician determined that he had received a concussion. Petitioner had head aches two to three times a week for several months after the initial concussion, but his parents never took him for a follow up visit with the doctor.

17.     Petitioner had a stable marital relationship in Tuscaloosa with his common law wife, which whom he had three children. Petitioner's family members related that Petitioner had worked legal jobs in the past in order to provide for his wife and children. Petitioner's sisters, Grace and Carolyn, related that their brother had an intense work ethic in which he had on occasion worked two jobs at once to support his family, which they attributed to his own recollections of growing up impoverished and his desire to have his children avoid the experience.

**The State Court's Disposition of the Claim**

The state habeas court adopted verbatim the State's proposed findings of fact and conclusions of law. The fact-findings recite that trial counsel adequately

investigated and presented mitigation evidence.  The court reiterated the evidence that was presented at trial and, while not having presided over trial,  found Saum's affidavit to be credible.  The court found that Saum conducted an investigation that constituted talking with Petitioner, his mother, his father, some of his sisters, and a girlfriend.  Saum also obtained Petitioner's school records and obtained the name of witnesses, including a special education teacher.  The court found that counsel formulated trial strategy for presenting evidence.  Counsel did not call Petitioner's mother based on Petitioner's wishes.  She also did not call his sisters because "they" chose not to testify.  The court found that there was no evidence that Petitioner's IQ affected his ability to determine right from wrong, and based on this, the court credited counsel's choice not to present Petitioner's teachers.  The court found that trial counsel presented some mitigation evidence at trial that was contained in the state writ application or they were prevented from presenting much of the other evidence; however, the court did not elaborate on this point.  The court likewise did not elaborate on what specific measures counsel took to investigate mitigation or if any measures were taken, what mitigation evidence they uncovered.  Instead, the court concluded that counsel were not deficient because they made decisions about presenting evidence during punishment based on a reasonable trial strategy to focus attention on guilt-innocence.

**Legal Basis for the Claim**

Petitioner incorporates by reference the legal analysis set forth in the first two grounds for relief as if set forth fully here.  Because of the severe limitations in funding, the state habeas court failed to provide a full and fair hearing on Petitioner's claim, even though he set forth facts that if true, would entitle him to relief.  Petitioner urges the Court to hold a hearing so he can present evidence in support of the claim.

Petitioner was deprived of the right to the effective assistance of counsel during the punishment phase of trial, in violation of the 6th and 14th Amendments to the United States Constitution, as a result of his trial attorneys' failure to undertake a sufficient investigation into Petitioner's character and background prior to determining whether to cut off further investigation and before formulating a trial strategy at punishment for the presentation of evidence.  *See, Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510  (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *and*,  *Strickland v. Washington*, 466 U.S. 668 (1984).  In the alternative, trial counsel failed to make use of reasonably available mitigating evidence and pursued an objectively unreasonable trial strategy by not presenting this mitigation evidence.  Trial counsel's lack of investigation and their failure to make effective use of the available mitigation evidence fell below objectively reasonable standards of professional representation in a capital proceeding.  Further, the failure

to investigate and present available mitigation evidence creates a reasonable probability that the results of the punishment proceedings would have been different; thus, Petitioner was prejudiced. *See, **Wiggins***, 539 U.S. at 521; *and*, **Strickland**, 466 U.S. at 694.

Specifically, the state habeas court's findings that trial counsel reasonably investigated mitigation evidence and, thus, formulated a reasonable and sound trial strategy is not based on a reasonable determination of the facts as presented in the state record. The record is simply silent concerning what measures trial counsel took to investigate, other than asking Petitioner to write out his life story as he recalled it on a notepad, and even with this minimal investigation, there is no evidence concerning what evidence counsel learned about Petitioner's background and character. Even if counsel did learn something from Petitioner's school records, they did not have sufficient facts to forego further investigation before deciding that his low IQ had no relation to his moral culpability, other than their assumption that he knew right from wrong. Counsel unreasonably cut their investigation short at this juncture. Counsel's decisions not to call any witnesses, other than Professor Lewis, during punishment was not based on a reasonable investigation. They simply did not have sufficient facts to make this determination about who to call and who to release. Additionally, the state court was not reasonable in determining that Petitioner did not

want "any" mitigation presented based on nothing more than his decision not to call his mother and his sisters' reluctance to testify further.  Put simply, they were unprepared to present a full case in mitigation, and their decisions were not based on sound trial strategy, as contemplated by *Strickland* and its progeny.  Finally, the state court's determination that counsel strategically decided to focus on guilt-innocence is not reasonable because this decision was not based upon a reasonable investigation.

The evidence demonstrates that the state court's determination of this ineffective assistance of counsel claim was contrary to and an unreasonable application of federal law as set forth in controlling Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Furthermore, the adjudication of this claim by the state court resulted from an unreasonable determination of the facts presented in the state court proceedings.  28 U.S.C. § 2254(d)(2).   Finally, the State of Texas, the state habeas court, and the Texas Court of Criminal Appeals have imposed limitations upon the fact-finding and fact-resolution procedures in state court proceedings which were necessary for an adequate investigation of, and resolution of the facts of Petitioner's constitutional claim consistent with 28 U.S.C. § 2254(d)(2).  For this reason, Section 2254(e)(2)(A)(ii) compels additional factual development and an evidentiary hearing on this claim.

D.   **GROUND FOR REVIEW NUMBER FOUR**

APPLICANT'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS, THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT, THE RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE 6TH AMENDMENT, AND THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS UNDER THE 8TH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT'S REFUSAL TO ALLOW QUESTIONING DURING VOIR DIRE ABOUT PAROLE ELIGIBILITY EFFECTIVELY PREVENTED HIM FROM DETERMINING HOW TO EXERCISE CHALLENGES FOR CAUSE AND PREEMPTORY STRIKES BECAUSE HE WAS LIMITED IN FINDING BIAS OR PREJUDICE AGAINST HIS PRIMARY DEFENSIVE STRATEGY AT PUNISHMENT.

E.   **GROUND FOR REVIEW NUMBER FIVE**

APPLICANT'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS AND THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS UNDER THE 8TH AMENDMENT TO THE UNITED STATES CONSTITUTION BECAUSE THE TRIAL COURT UNCONSTITUTIONALLY LIMITED THE PRESENTATION OF CRUCIAL DEFENSIVE EVIDENCE CONCERNING HIS STATUTORILY MINIMUM PERIOD OF INCARCERATION UNDER THE THEN EFFECTIVE PAROLE ELIGIBILITY STATUTE AND HOW THIS EVIDENCE RELATED TO HIS DEFENSIVE THEORY.

F.   **GROUND FOR REVIEW NUMBER SIX**

APPLICANT'S CONVICTION AND DEATH SENTENCE VIOLATE THE DUE PROCESS CLAUSE OF THE 5TH AND 14TH AMENDMENTS, THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT, THE RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE 6TH AMENDMENT, AND THE PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS UNDER THE 8TH AMENDMENT TO THE

UNITED STATES CONSTITUTION BECAUSE THE FAILURE TO INSTRUCT THE JURY ABOUT PAROLE ELIGIBILITY EFFECTIVELY PRECLUDED THE JURY FROM CONSIDERING AND GIVING EFFECT TO CRUCIAL MITIGATION EVIDENCE PROMPTING FOR A SENTENCE OF LIFE IMPRISONMENT RATHER THAN DEATH.

**Factual Summary**

1.      During voir dire, Petitioner's trial counsel requested to ask the venire questions relating to parole eligibility, specifically, questioning jurors about their attitudes to the issues of future dangerousness and mitigation in light of their being informed that a life sentence following a capital conviction would render Petitioner ineligible for probation until he had served at least 35 calendar years.   However, the trial court sustained the State's objection to advising the jurors regarding the 35 year parole ineligibility and restricted Petitioner's voir dire on this matter.

2.      During the punishment phase of Petitioner's trial, trial counsel presented testimony by Dr. Peter Lewis, a criminologist and law professor at South Texas College of Law, about maturational reform, a widely accepted theory that violent behavior tends to decrease with age.

3.      In his proffer to the court prior to Lewis's testimony, Petitioner explained to the trial court that part of the defense's mitigation case involved asking Lewis how a person like Petitioner–who was 24 years old at the time of trial and had one incident of bad conduct in jail awaiting trial–would fare on Lewis's theory of maturational

reform, particularly in light of the fact that he would be required to serve a minimum of 35 years before being eligible for release on parole.  Petitioner contended to the trial court, and Lewis concurred on the record,  that in such a situation, the likelihood that someone like Petitioner would pose a continuing threat for violence in free society after having served 35 years imprison was quite low.

4.      The state objected to this testimony on several grounds.  Most broadly, the State objected that it was not relevant to any of the special issues.  The State also objected that it was inappropriate to present evidence about parole to the jury because, according to the State, the jury was only to decide between life and death.  From this standpoint, the State asserted that the evidence was not relevant to future dangerousness.  Finally, the State objected to Lewis qualifications as an expert. Petitioner responded that it was particularly relevant to future dangerousness, which was a question that the jury would have to decide, and Petitioner pointed out that the jury did not simply decide life or death, but answered special issues.  Petitioner also asserted that the evidence was relevant to Petitioner's character, and, as such, the evidence was relevant to the mitigation special issue.

5.      The trial court overruled the State's objections to Lewis's qualification and the relevancy of his testimony, and allowed Lewis to testify in general about maturational reform.  The court refused, however, to permit Lewis to testify that

Petitioner would have to serve a minimum of 35 years before becoming eligible for parole.

6.      Lewis explained before the jury the concept of maturational reform: over time as individuals age, they tend to become less violent, regardless of whether he receives any particular treatment for his violent behavior.  A structured environment, such as incarceration, played an important factor in the decrease of an individual's violence.   He noted that it was infrequent to see individuals in their 50s's and 60's charged with an criminal offense.   In light of the trial court's ruling,  Petitioner was precluded from asking Lewis to draw a link from the general theory of maturational reform  to Petitioner's specific situation.

6.      After the close of evidence, counsel also requested the trial court include an instruction in the punishment phase jury charge informing the jury that under the applicable parole statute, Petitioner would have to serve a minimum of 35 years before becoming eligible for parole.   The trial court denied the instruction.

7.      The trial court did include an instruction that the jury was not to consider parole in making its determination on the special issues.  Petitioner objected to this aspect of the charge because it suggested to the jury that parole was available and, as such was misleading.  Petitioner urged the court either to be remove this instruction

or to include a charge showing when parole eligibility would become available.  The court overruled the objections.

8.    On direct appeal and state habeas, Petitioner challenged on Due Process, Equal Protection,  and  8th Amendment grounds, the trial court's the restrictions of his defense through the refusal to allow voir dire, its failure to include an instruction to the jury, and its refusal to allow testimony about the minimum length of sentence before Petitioner could become eligible for parole.

**The State Court's Disposition of the Claim**

On direct appeal, the Court of Criminal Appeals simply noted that it had addressed these issues on previous occasions and that it did not see any reason, based on Petitioner's arguments, to revisit them.  *Brown v. State, slip op at  4, 56.*  On habeas review, the state habeas court noted that the claim had been  rejected on direct appeal and the court did not have to address the claim on habeas.   Nevertheless, the state habeas court proceeded to address the merits and conclude that the Court of Criminal Appeals was correct on direct appeal.

**Legal Basis for the Claim**

By precluding Petitioner from presenting evidence, and/or by denying a general instruction to the jury that Petitioner would have to serve a minimum of 35 years before becoming eligible for parole, the trial court deprived him of his right to due

process under the 5th and 14th Amendments and injected arbitrariness into the capital

sentencing in violation of the 8th Amendment by limiting the full and effective

presentation of his mitigating evidence of maturational reform, as well as permitting

the jurors to speculate concerning the existence of parole in assessing a life sentence.

In *Simmons v. South Carolina*, the Supreme Court held it a violation of a

defendant's right to due process to preclude the jury from receiving an instruction

regarding the defendant's parole ineligibility under state law when the State put future

dangerousness into issue in punishment.  512 U.S. 154, 162, 164 (1994).  *See also id.*,

512 U.S. at 177-178 (O'Connor, J., concurring).  The Supreme Court's reasoning in

*Simmons* was limited to the Due Process Clause, and the Court refused to entertain

the Eighth Amendment aspect of the issue.  *Id*. at 162 n.4 ("We express no opinion

on the question whether the result we reach today is also compelled by the Eighth

Amendment.").  Likewise, the Court did not entertain equal protection considerations

as part of its decision.  The Court's holding was based in part upon its decisions in

*Skipper v. South Carolina*, 476 U.S. 1 (1986), in which the Court held that Due

Process Clause, as well as the 8th Amendment, requires that a capital defendant be able

to introduce any relevant evidence to rebut the State's evidence of future

dangerousness, and *Gardner v. Florida*, 430 U.S. 349 (1977), in which the Court held

it to be a violation of due process to sentence a defendant based upon evidence which

48

he is denied the opportunity to contradict or explain. *Simmons*, 512 U.S. at 164-165. The *Simmons* Court explained that due process required the defendant be provided the means of rebutting the State's evidence of future dangerousness by informing the jury of the sentencing alternative to a death sentence–life imprisonment without the possibility of parole.

Since *Simmons*, the Court has apparently limited the scope of the rule to the facts contained in *Simmons*, particularly that the defendant in that case was ineligible for parole ever and would have to spend the rest of his natural life behind bars. *See Shafer v. South Carolina*, 532 U.S. 36, 39-40 (2001) *and*, *Ramdass v. Angelone*, 530 U.S. 156, (2000) (same). However, both these cases dealt with the basic *Simmons* issue concerning whether a state court must *instruct* the jury about parole ineligibility when future dangerousness is made an issue in the case. These cases did not address the situation in which a defendant attempts to present mitigation evidence at punishment that is tied to parole eligibility issues, as happened in this case. Also, *Ramdass* and *Shafer* did not address equal protection or Eighth Amendment aspects of this sort of evidence. Finally, these cases did not address whether an instruction may be required when the circumstances in the case and in the charge as a whole make the charge misleading and whether due process requires an additional charge in such a situation.

49

At the time of Petitioner's trial, Texas did not provide for a "life without parole" sentencing option. Rather, if given a life sentence, a capital defendant would have had to serve a minimum of 35 calendar years, without reduction for any good conduct, before becoming eligible for parole. *See* Art. 42.18, § 8(b)(2), Texas Code of Criminal Procedure (West Supp. 1992). As noted by the court, the Court of Criminal Appeals has held this distinction between Texas law and the factual situation in *Simmons* justifies the denial of a parole eligibility instruction in the punishment charge at a capital case. *See Smith v. State*, 898 S.W.2d 838 (Tex.Crim.App. 1995). Ostensibly, however, the court has extended *Simmons* not only beyond its facts, but also beyond its basic holding as a due process case. *See Willingham v. State*, 897 S.W.2d 351 (Tex.Crim.App. 1995) (holding that parole eligibility does not bear any relationship to a defendant's background or character). *Simmons*, and its limitations by subsequent cases, do not justify a wholesale dismissal of the claims that make up Petitioner's complaint.

On a petition for writ of certiorari to the Texas Court of Criminal Appeals on direct appeal in this case, four justices on the Supreme Court acknowledged that the *Simmons* holding cannot be logically limited based on nothing more than the distinction between the sentencing options of "life without parole" and "life with parole." In *Brown v. Texas*, 522 U.S. 940, 118 S. Ct. 355 (1997), these four

50

justices–three of whom comprised the core of the ***Simmons*** decision – recognized the problematic nature of this particular case. ***Id***. at 355 (Stevens, J., joined by Souter, Ginsburg, and Bryer JJ., concurring in denial of cert.). After noting that Texas prohibits giving "truthful information to the jury about when he would be eligible for parole" and that Texas set parole eligibility at 35 years, the concurrence stated: "[Petitioner] sought to present this truthful information to the jury, *coupled with evidence that people become less dangerous over time*. He was prohibited from doing so by Texas law." ***Id***. (emphasis added). The concurrence continued:

> There is obvious tension between this rule and our basic holding in ***Simmons v. South Carolina***.... As Justice SCALIA correctly observed, a logical application of that holding would permit "the admission of evidence showing that parolable life-sentence murders are in fact almost never paroled, or are paroled only after age 70; ... or evidence showing that, though under current law the defendant will be parolable in 20 years, the recidivism rate for elderly prisoners released after long incarceration is negligible." ...

> . . .

> The situation in Texas is especially troubling. In Texas, the jury determines the sentence to be imposed after conviction in a significant number of noncapital felony cases. In those noncapital cases, Texas law requires that the jury be given an instruction explaining when the defendant will become eligible for parole. Thus, *the Texas Legislature has recognized that, without such an instruction, Texas jurors may not fully understand the range of sentencing options available to them*. Perversely, however, in capital cases, Texas law prohibits the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death. *The Texas rule unquestionably tips the*

> *scales in favor of a death sentence that a fully informed jury might not impose*.

*Id*. at 355-56 (citations and footnotes omitted) (emphasis added).   Concurring in **Simmons**, Justice O'Connor likewise noted that **Simmons** was limited because it did not a situation in which a defendant tried to present evidence during the punishment phase of a capital trial.   **Simmons v. South Carolina**, 512 U.S. at 176 (O'Connor, J., concurring in the judgment).   "Unlike in **Skipper**, where the defendant sought to introduce *factual evidence* tending to disprove the State's showing of future dangerousness, petitioner sought to rely on the operation of South Carolina's sentencing law in arguing that he would not pose a threat to the community if he were sentenced to life imprisonment."   *Id*. (emphasis added) (citations omitted).   Likewise, in this case, Petitioner did not rely "exclusively" on the Texas sentencing law but, instead, attempted to present factual mitigating evidence that was tied to the sentencing law in order to rebut the State's case that he would be a future danger. This distinction is not without a difference, as ostensibly noted by various justices of the Supreme Court.   With this framework in mind, Petitioner asserts that he is entitled to relief.

<u>The Eighth Amendment</u>.   The state trial court's refusal to permit Petitioner to present evidence concerning maturational reform, particularly as it related to the time he would have to serve under a life sentence prior to becoming eligible for parole, or

to instruct the jury regarding his parole eligibility, promoted the arbitrary imposition of the death penalty, in violation of the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution.

The constitutionality of the death penalty under the Eighth Amendment is premised upon the narrowing of offenses for which a defendant is eligible for the death penalty, and, once eligible, the expansion of relevant mitigating criteria in which the jury may consider in opting for a sentence of less than death. *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998). *See also, Jurek v. Texas*, 428 U.S. 262, 270-72 (1976). Underlying this requirement is the understanding that the imposition of the death penalty should be the exception, rather than the rule. *See generally Woodson v. North Carolina*, 428 U.S. 280, 292 - 298 (1976) (detailing development of sentencing alternatives to mandatory death sentences in response to reluctance of juries to return guilty verdicts under mandatory death penalty schemes); *Gregg v. Georgia*, 428 U.S. 158, 182 (Stewart, J., joined by Powell, J., and Stevens, J) (holding that although capital punishment is not per se violative of the Eighth Amendment, "the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases.").

53

In *Locket v. Ohio*, 438 U.S. 586 (1978), the Supreme Court addressed the requirement that a jury be able to consider mitigating evidence that had animated its decisions in the series of cases that included *Jurek*. In *Lockett*, a plurality of the Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id*. at 604 (emphasis in original). Also, the Court held that an "individualized decision is essential in capital cases." *Id*. at 605. The Court recognized that, when it came to the degree of sentencing discretion that a jury may exercise in death penalty cases, its cases had not been always easy to decipher, so the Court attempted to provide "the clearest guidance" it could. *Id*. at 602. Though *Lockett* was a plurality opinion, the Court later adopted its essential holdings that individualized sentencing is required in death penalty cases and that the sentencer may not be precluded from considering any aspect of the defendant's character and record and the circumstances of the offense that may support a sentence less than death. *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). In *Eddings*, a majority of the Court made it clear that the introduction of mitigating evidence is not enough if the sentencer refuses to consider such evidence as a matter of law. *Id*. at 113-14. Thus,

54

the Court contemplated that the sentencer would be able to give effect to this evidence. *Id*. at 114-15 & n.10 (holding that even though state law allowed a defendant to present mitigating evidence, *Lockett* required the "sentencer to listen"). *See also Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) (holding that requirement that sentencer not consider nonstatutory, but otherwise relevant mitigating evidence rendered a death sentence invalid). In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court noted that the rules in *Lockett* and *Eddings* "are now well established ...." *Id*. at 4.

In this case, Lewis's testimony that someone like Petitioner would go through a natural reform process as he matured, that was functionally related to the structured environment in prison *as well as* the length of time Petitioner would have to spend there by law, was both relevant to the future dangerousness issue, as crucial rebuttal to the State's case in support of an affirmative answer to that special issue, and to the mitigation special issue because it related to Petitioner's probable character as he matured in prison. Thus, the trial court's limitations on Petitioner's defense violated the clearly established principles of *Lockett* and its progeny. Furthermore, the denial of information, both through evidence and possibly an instruction, to a capital jury which could affect that jury's decisions between a life sentence and a death sentence denied that jury necessary information for its decision about which sentence is

appropriate.  *See* **Simmons v. South Carolina**, 512 U.S. at 172 ("The Eighth Amendment entitled a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed") (Souter, J., concurring).  The denial of accurate information about the alternative to a death sentence under Texas law "unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose."  **Brown v. Texas**, 118 S. Ct. at 356 & n.2.  Given public beliefs about parole in the criminal justice system, a sentencing jury might conclude that a defendant serving a "life" sentence will almost certainly be subject to a much earlier release.  *Cf.* **Simmons**, 512 U.S. at 169-170. *See also* , *Bowers, Vandiver & Duggan*, A New Look at Public Opinion on Capital Punishment: What Citizens and Legislators Prefer, 22 AmJ.Crim.L 77 (1994).  This belief, coupled with the instruction that the jury actually received that it could not consider parole, risked informing the jury that Petitioner could be released if given a life sentence, and this misperception could have led the jury unreasonably to favor death rather than life. This, in turn, further undercut Petitioner's primary defense at punishment.

Accordingly, by restricting Petitioner's defense in this manner, the trial court effectively prevented the jury from being fully informed of its sentencing options. The jury could not effectively consider and give effect to mitigating evidence regarding the decreasing probability of his continued violence with age.   This

indisputably limited Petitioner's ability to effectively present mitigating evidence in violation of the Eighth Amendment.

*Due Process*. The failure to permit the introduction of evidence relating to the length of time a capital defendant would have to serve under a life sentence prior to becoming eligible for parole or to instruct the jury regarding a capital defendant's parole eligibility violates the right to due process under ***Simmons***, in its most broad application, as exemplified in ***Boyde v. California***, 494 U.S. 370, 380 (1990). In ***Boyde***, a reviewing court must determine whether there is a reasonable likelihood that the jury applied the jury charge in a manner that prevented it from considering constitutionally relevant evidence. ***Id***., at 380. *See also **Abdul-Kabir v. Quarterman***, 550 U.S. 233, 127 S. Ct. 1654, 1673-74 (2007). ***Simmons*** is predicated in part on the ***Boyde*** reasonable likelihood test. ***Simmons v. South Carolina***, 512 U.S. at 170-71. The Court rejected the argument that an instruction that "life sentence" should be taken in its plain and ordinary meaning somehow cured the likelihood that the jury in that case misunderstood that the life sentence it could impose would be for sometime less than the defendant's natural life. ***Id***. Instead, the Court found a reasonable likelihood that the jury would misapply the instructions in the charge in an unconstitutional manner.

In this case, there was a reasonable likelihood that the jury understood that if it imposed a life sentence that Petitioner could make parole at an earlier, but unspecified date, which undercut the defense Petitioner tried to establish through maturational reform and Lewis's testimony. As Petitioner pointed out to the trial court, the instruction that the jury not consider parole as part of its deliberative process risked informing the jury that parole was available and invited unwarranted speculation. At this point, accurate and truthful information should have been given to the jury.

Similarly, as with the Eighth Amendment, due process requires a defendant be permitted to introduce to the jury any relevant mitigating evidence which may form the basis for a sentence of less than death. *See,* ***Penry v. Lynaugh***, 492 U.S. 302, 327-328 (1989); ***Skipper v. South Carolina***, 476 U.S. at 4-6 & n.1 (1986); ***Eddings v. Oklahoma***, 455 U.S. at 113-114 (1982). As in ***Simmons***, Petitioner had a due process right to present evidence to rebut the State's case against him. ***Simmons v. South Carolina***, 512 U.S. at 161-62 ("The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" (quoting ***Gardner v. Florida***, 430 U.S. at 362)).

The trial court's refusal to permit Petitioner to present testimony about, or to include a jury instruction regarding the minimum amount of time he would be

incarcerated prior to becoming eligible for parole, particularly in light of the testimony about maturational reform, denied Petitioner due process because it prevented the jury from receiving relevant evidence with which the jury could give effect to the testimony about maturational reform.

*Equal Protection*.   The Equal Protection Clause of the 14th Amendment essentially guarantees that similarly situated persons must be treated in an equal manner. ***City of Cleburne v. Cleburne Living Center***, 473 U.S. at 439 (citing ***Plyler v. Doe***, 457 U.S. 202, 216 (1982).   The right to Equal Protection is violated when similarly situated persons are treated unequally for which there is no legitimate basis. *See,* ***Cleburne Living Center***, 473 U.S. at 439.

The Texas Constitution permits sentencing juries be informed of the existence of parole laws,  TEX.CONST. Art. 4, § 11(a), and  pursuant to this, the Texas Legislature enacted laws which  required  the trial court to provide specific instructions regarding parole eligibility. *See* TEX. CRIM. P. CODE ANN. Art. 37.07, §4. The Legislature created only one exception: *capital murder* defendants.  *Id*.  Thus, Article 37.07, § 4 has on its face created two cognizable classes of criminal defendants:  capital defendants and non-capital defendants  The statute then treated these classes differently by informing juries in non-capital cases about parole, but withholding such information from  juries in capital cases.  The concurring opinion

in *Brown* found this inconsistent treatment "especially troubling." *Brown v. Texas*, 114 S.Ct. at 356. The dissimilar treatment of capital murder defendants and non-capital defendants does not further a compelling government interest, nor, in the alternative, it is not rationally related to a legitimate government purpose.

Article 37.07, §4, also creates a second, but equally arbitrary distinction between criminal defendants: capital murders and non-capital murders. Although life imprisonment was a punishment option for both non-capital murders and capital murders, while juries in the former group would be informed of parole eligibility, juries in the latter group would not be so informed. Again, the dissimilar treatment between capital murders and non-capital murders did not further a compelling government purpose, nor, in the alternative, was supported by a legitimate government interest in distinguishing between capital murderers and non-capital murders. The failure to provide a parole instruction or to otherwise permit the introduction of parole eligibility evidence to the jury violated a capital defendant's right to Equal Protection.

Other than an oblique reference to Petitioner's claims in the findings of fact and conclusions of law, as adopted by the Court of Criminal Appeals, and citations to its prior case law in its opinion on direct appeal, it is not entirely clear that the state court addressed all of Petitioner's claims "on the merits." Thus, *de novo* review may apply

to some or all of these claims.  Assuming *arguendo* that the state court's disposition

is a final decision on the merits of each claim, the Court of Criminal Appeals, acting

both as the court considering the direct appeal and as the state habeas court, decided

these issues contrary to controlling Supreme Court precedent, or, alternatively, the

court unreasonably applied this precedent to Petitioner's case.   28 U.S.C. §

2254(d)(1).  Petitioner is entitled to relief.

### G.    GROUND FOR REVIEW NUMBER SEVEN

**PETITIONER WAS DENIED THE RIGHT TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE 5TH, 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION DURING THE POST-CONVICTION PROCESS AS A RESULT OF THE STATE HABEAS COURT AND TEXAS COURT OF CRIMINAL APPEAL'S DENIAL OF PETITIONER'S ACCESS TO MATERIAL EVIDENCE IN ORDER TO CONDUCT INDEPENDENT FORENSIC ANALYSIS TO DEVELOP STATE POST-CONVICTION CLAIMS.**

### H.    GROUND FOR REVIEW NUMBER EIGHT

**PETITIONER WAD DENIED THE RIGHT TO DUE PROCESS OF LAW UNDER THE 5TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY THE STATE KNOWINGLY PRESENTED MATERIAL AND FALSE TESTIMONY BY HOUSTON POLICE DEPARTMENT BALLISTICS EXAMINER C.E. ANDERSON REGARDING THE MATCH BETWEEN FIREARMS AND BULLET SLUGS ON THE ALLEGED MURDER WEAPONS.**

**Factual Summary**

1.     The alleged murder weapons in this case consisted of a Charter Arms .38 caliber revolver, a photo of which was admitted during trial as Defendant's Exhibit 98, and a Smith & Wesson .357 magnum revolver, which was admitted as State's Exhibit 101.

2.     Tuscaloosa County Sheriff's Department Homicide Detective John Steele testified at trial that he located a Smith & Wesson Model revolver in the property room of the Sheriff's Department and, at the request of Texas authorities, shipped the weapon to Charles E. Anderson, a ballistics examiner for the Houston Police Department.  According to Steele, the Smith & Wesson revolver was seized  from a local individual named DeAndrea Dunn approximately two weeks after the murders in Texas.  Steele contended that Dunn was an "associate" of Petitioner and that individuals in the drug trade in Tuscaloosa frequently traded firearms.

3.     Detective Steele also located in the possession of the Tuscaloosa Sheriff's Department a Charter Arms .38 caliber revolver that had been discovered at a crime scene  in December 1992 near the body of an individual named  Marcus Hill.   Steele did not know Hill to be an associate of Petitioner or anyone in his group of associates.  The weapon was not released because it was the subject of a pending homicide

prosecution, but two bullets test fired from the Charter Arms .38 caliber revolver were sent to Anderson in Houston in September 1993.

4.      Houston Police Department ballistics examiner Charles Anderson testified that his department conducted examinations on eight bullets EB ("evidentiary bullet") 1 through 8, recovered from the decedents in the Harris County Morgue. Anderson stated that two bullets, EB1 and EB 3 matched with bullets fired from the Smith & Wesson .357 caliber revolver.

5.      Anderson also compared the bullets with the two test bullets fired from the .38 caliber Charter Arms revolver.  Anderson concluded that four bullets recovered from the decedents,  EB 2, 5, 6 and 8, matched the test bullets fired from the .38 Charter Arms revolver.

6.      Anderson could not find matching characteristics for the two remaining bullets, EB 4 and 7.

7.      Petitioner, through his undersigned counsel, has a good faith belief that the testimony by Houston Police Department ballistics examiner Anderson is materially false and misleading and that he has a sufficient basis to seek an independent ballistic examination.

8.      This skepticism of the work product of the Houston Police Department is not without justification, as evinced in recent years by scandals occurring within the

Houston Police Department crime lab.  These identified problems include problematic ballistic examinations, including examinations conducted by Anderson himself.  *See* Steve McVicker, <u>Ballistics Lab Results Questioned in 3 Cases</u>, March 14, 2005 (reported in www.chron.com/disp/story.mpl/special/crimelab/3083288.html) (discussing  HPD ballistics problems in cases of Martin Draughon, Willie Washington, and Nanon Williams); *and*,  Roma Khanna and Steve McVicker,  <u>Probe Finds HPD Crime Lab got Scant Backing</u>,  August 8, 2005 (reported in <u>www.chron.com/</u> disp/story.mpl /special/crimelab/3248711.html) (noting ballistics problems in Nanon Williams capital murder case).  *See also **Williams v. Quarterman***, No. 05-20350, * WL *, at * (5th Cir., Dec. 9, 2008)  (discussing faulty ballistics by HPD ballistics examiner in Nanon Williams case); *and, **Draughon v. Dretke***, 427 F.3d 286 (5th Cir. 2005) (discussing erroneous ballistics testing by HPD Crime lab and Charles Anderson).

9.     Petitioner filed an *ex parte* motion with the state habeas court on or about January 28, 1998, in which he requested the state habeas court instruct the Harris County Sheriff's Department and the Houston Police Department to turn over the firearms and bullets in their possession that are connected with Petitioner's case.  The motion was hand delivered to the state habeas court by local Houston defense attorney

Michael Charlton on behalf of Petitioner's Austin-based attorney. The state habeas court orally denied the motion.

10. Petitioner subsequently filed an *ex parte* motion with the Texas Court of Criminal Appeals requesting the Court of Criminal Appeals to instruct or authorize the state habeas court to sign the "turn over" order to permit Petitioner to obtain independent forensic analysis of the bullets. The Texas Court of Criminal Appeals denied Petitioner's motion "*without prejudice* to reurge in the trial court upon filing of writ. *See*, Exhibit F: *Applicant's Ex parte Motion for Order Authorizing and/or Instructing District Court to Sign "Turn Over" Order to Houston Police Department and Harris County Sheriff's Office for Bullets and Firearms*. 11. In the absence of independent forensic analysis of the firearms and bullets, Petitioner was unable to fully investigate the claim and conclusively present evidence within his writ application that the forensic analysis by Anderson was flawed and that his subsequent testimony was false or misleading.

12. Petitioner nevertheless requested an evidentiary hearing in his state post-conviction writ application. In a separate document, he subsequently requested that "he be permitted to examine and conduct independent tests upon the requested evidence." *See*, Exhibit G: *Objection to Inadequate Fact-Finding Procedures and*

*Request for Evidentiary Hearing.*   As part of this motion, Petitioner requested as relief that the state habeas court:

> . . .
>
> (2)   Set the case for a scheduling hearing to determine the date for a live evidentiary hearing and for presentation of essential discovery matters; [and]
>
> (3)   Re-consider and grant Applicant's previously filed motion to permit forensic testing necessary to resolve the ballistics issue . . .

The state habeas court denied Petitioner's request for an evidentiary hearing, and took no action upon the request for discovery other than implicitly denying the request through the court's adoption of the State's proposed findings of fact over one year following the submission of the objection and proposed fact-findings.

### The State Court's Disposition of the Claim

The state habeas court adopted verbatim the State's proposed findings of fact and conclusions of law.  The findings, after reiterating much of the trial testimony, the state habeas court found Petitioner's claims with respect to the ballistics evidence was wholly speculative and that there was no evidence to support it.  The findings discounted Petitioner's assertions that the denial of funding and access to the ballistics evidence impacted on the overall fairness of the proceedings or the court's ultimate findings.  In the alternative, the findings recited that even if the State did present false

66

testimony with respect to the ballistics evidence, Petitioner was not harmed by this presentation.

**Legal Basis of Claim**:

Petitioner incorporates by reference the legal analysis set forth in the first two grounds for relief as if set forth fully here.  Because of the severe limitations in funding, the state habeas court failed to provide a full and fair hearing on Petitioner's claim, and by denying him any funding or access to the ballistics evidence, the state habeas court denied him even a rudimentary chance to discover facts that if true, would entitle him to relief.  Petitioner urges the Court to permit further factual development necessary for the claim and to hold a hearing so he can present evidence in support of the claim.

Petitioner has been deprived of the opportunity to fully and fairly develop and litigate all claims which may exist which could challenge the basis of his conviction for capital murder and sentence of death, in violation of the right to Due Process of Law under the 5th and 14th Amendments to the United States Constitution.  A fundamental requirement of due process is the right to be heard in a "meaningful time and in a meaningful manner." ***Hamdi v. Runsfeld***, 542 U.S. 507, 533 (2004) (quoting ***Fuentes v. Shevin***, 407 U.S. 67, 80 (1972)), *and*, ***Armstrong v. Manzo***, 380 U.S. 545, 552 (1965).   In the context of a post-conviction challenge to a capital conviction,

meaningful access contemplates a full and fair opportunity to investigate, develop and litigate the claims. ***Townsend v. Sain***, 372 U.S. 293, 316 (1963). *See also,* ***Boumediene v. Bush***, ___ U.S. ___, 06-1195, p. 62 (U.S. 6-12-2008) ("in post-trial habeas cases *where the prisoner already has had a full and fair opportunity to develop the factual predicate of his claims* . . . limitations on the scope of habeas review may be appropriate." *See*, ***Williams v. Taylor***, 529 U. S. 420, 436-437 (2000)")) (emphasis added). By depriving Petitioner of the basic opportunity to conduct an independent ballistics analysis of the weapons which the State attempted to link Petitioner and his associates to the murders, both prior to the filing of the writ application, and after the filing of the writ application, the state habeas court deprived Petitioner of a meaningful opportunity to investigation, develop, plead and prove his claim. For this reason, Section 2254(e)(2)(A)(ii) compels additional fact-finding procedures and an evidentiary hearing.

If after a proper investigation and expert analysis, the forensic analysis by HPD forensic analyst Charles Anderson is proven to be false and that the bullets from one or more identified weapons do not match the evidentiary bullets obtained from the decedents, then the State has presented material false and misleading evidence, *see* ***Pyle v. Kansas***, 317 U.S. 213 (1942); ***Mooney v. Holohan***, 294 U.S. 103 (1935); ***Alcorta v. Texas***, 355 U.S. 28 (1957), and has withheld material favorable evidence,

68

*see **Kyles v. Whitley***, 514 U.S. 419 (1995), in violation of the 5th and 14th Amendments to the United States Constitution.

The state habeas court's adjudication of this claim was both contrary to and an unreasonable application of controlling federal law, as established by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Furthermore, the adjudication of Petitioner's claim by the state habeas court results from an unreasonable determination of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d)(2).

## I.      GROUND FOR REVIEW NUMBER NINE

**PETITIONER'S CONVICTION VIOLATES DUE PROCESS OF LAW UNDER THE 5TH AND 14TH AMENDMENTS AS A RESULT OF THE STATE'S COERCION OF WITNESS OF CAROLYN MOMOH TO MAKE FALSE STATEMENTS UNDER OATH, AND BY KNOWINGLY PRESENTING FALSE AND MISLEADING TESTIMONY TO THE JURY.**

**Factual Summary**

1.      The State sought to present testimony during the guilt-phase of trial from Petitioner's sister, Carolyn Momoh, regarding inculpatory statements which Petitioner allegedly made to her following the killings.

2.      On June 22, 1992, Momoh was interrogated in Tuscaloosa, Alabama, by local law enforcement officers concerning her knowledge of events relating to Petitioner's trip to Houston on June 20, 1992, and return to Tuscaloosa on June 21,

1992.  The interview, which lasted approximately one and a half hours,  was tape recorded and transcribed.

3.      During the interview, Momoh stated that Petitioner and three friends arrived at her home in Southwest Houston from Tuscaloosa in a rented mini van. Petitioner initially told her that he and his friends would be in town for a couple of days, but later that evening, Petitioner told her that he wanted to return early, by air, and asked her to drive the mini van back to Tuscaloosa.  He indicated that being caught on the road could affect his probation.   The next morning, Momoh drove Petitioner and one of his friends, "Tony" to the airport.  The other two friends had left earlier that morning  by cab.  Momoh and her half sister, Serisa, then drove the van to Tuscaloosa and stayed in a motel.  While in Tuscaloosa, they spoke with their sister Grace, who remained in Houston.  Grace told them that she had learned on the news of a quadruple homicide in which three black males driving a mini van with Alabama plates were the suspects.  While discussing with her sister Serisa whether Petitioner had implicated them in some type of wrong doing–Carolyn suspected a possible robbery–Petitioner and "Tony" showed up at their motel room.   Carolyn confronted Petitioner about what she had heard, but Petitioner "didn't say a word, he just looked at [her]."  According to Carolyn, nobody told her anything about what happened.  *See* Exhibit H:  *Transcript of June 22, 1992 Interrogation of Carolyn  Momoh.*

3.     Upon her return to Houston a few days later, Momoh was interrogated at length, this time by Homicide Detectives Novak, Webber, and Carroll from the Houston Police Department.  The interrogation lasted for several hours, during which time the police isolated Momoh from her sisters and the friend, Kirk Royster, who had accompanied them.   The interview resulted in a four page type-written sworn statement prepared by the police and signed by Momoh.  The written statement recites that Petitioner had stated to Momoh that he "had killed six Mexicans," providing to her (unspecified) details about the murders, and also stated that "he was tired of the killings." *See,* Exhibit I: *Written Statement by Carolyn Momah dated June 26, 1992.* The detectives released Momoh after she signed the statement.   Momoh's interrogation by the Houston police was neither video taped nor audio taped.

4.     Momoh subsequently hired an attorney who contacted the Harris County District Attorney's Office, notifying the State that if Momoh were called as a witness, she would recant her June 26 statement to the Houston Police Department and testify that the statements in which Petitioner admitted to the killings were false.

5.     The State nonetheless called Momoh as a witness at trial.  On November 5, 1993, in a hearing outside the jury's presence, Momoh announced that she would invoke her Fifth Amendment privilege against self-incrimination in order to avoid potential charges of aggravated perjury with respect to her June 26 statement.

Speaking through counsel, Momoh advised the trial court that her June 26 statement contained "inaccuracies" and that she understood from representations made to her that if her testimony at trial differed from her June 26 statement, then the State would charge he with perjury.   The court took the issue under advisement until November 8.  [Vol. 29 RR: 200 - 204].

6.      On November 8,  Momoh reasserted her intention to invoke her 5th Amendment privilege based on her concerns with being charged with perjury for recanting on her June 26 statement and for any other aspect of her testimony that might have given rise to a prosecution.  The State denied any foreknowledge that Momoh would recant portions of her June 26 statement, but offered testimonial immunity as a remedy to any statements which he might make implicating her in drug trafficking.  The State adhered to the position that it believed Momoh's June 26 statement as true and would not offer immunity from prosecution if she testified differently from that statement.   The State requested a hearing outside the presence of the jury to determine what facts Momoh would testify to, but  Momoh invoked  her 5th Amendment privilege against testifying at the preliminary hearing and the trial court placed her in coercive contempt.  [Vol. 30 RR: 8 - 97].

7.     Following the order for contempt, Momoh petitioned the Texas Court of Criminal Appeals with a writ of habeas corpus to secure her release, but the court ultimately denied relief.

8.     On November 16, 1993, Momoh again appeared before the trial court and testified outside the presence of the jury.  Speaking through counsel, Momoh clarified that she was testifying as a result of being placed in coercive contempt for invoking her Fifth Amendment privilege.  She also advised the trial court that it was her understanding was that she would be charged with aggravated perjury if her testimony differed, *either outside the jury's presence, or before the jury*, from her June 26 ,1992 statement.  [Vol. 36 RR: 21].   The State cautioned Momoh that it would prosecute her for aggravated perjury if it believed that the inconsistencies in her trial testimony from her June 26 statement were material:

> There may well be some inconsistencies.  Obviously, we are not concerned about what the weather was that day but if there are inconsistencies that are material within the legal definition of materiality then we will have to look at that.  Whether we can pursue a perjury prosecution depends on what those differe3nces are and what the evidence is that's available.  It depends upon whether *we believe* she perjured herself.

[Vol. 36 RR: 22 - 23, 30].   The court then conducted a hearing outside the presence of the jury in which Momoh testified  consistently with her June 26 statement.  [Vol. 36 RR: 38].

73

9.     On subsequent direct examination before the jury, Momoh testified about the facts of Petitioner's visit to Houston on June 20, 1992, and the abrupt departure the following day.   During her testimony, the State elicited Petitioner's alleged statements to her inculpating himself in the murders:

[By prosecutor]:     What did he say to you?

A:     He was joking around in his normal fashion and I was serious and he said to me I shot six Mexicans.

* * *

Q:     Did he ask you or did he tell you that something had gone down last night?

A:     Yes.

Q:     Was that when to told you he had shot six Mexicans?

A:     I don't know which statement came first.

Q:     If you would refer to Page 3 of your statement and look at the largest paragraph there about the middle of it and read the center portion of the paragraph to refresh your memory.

A:     He said to me if I saw the news, something went down last night and he shot six Mexicans.

Q:     Did he say shot or did he say kill?

A:     Kill.

* * *

74

Q:     Did he talk to you about the details or start to talk to you about the details of the killing?

A:     I don't remember.

Q:     If you would read that paragraph with the statement to see if it refreshes your memory.

A:     My statement says he spoke to me about the details but I do not remember any details.

Q:     After he said he had to get away do you recall him saying anything about being tired of the killings?

A:     Yes.

Q:     Did he say that one time or more than one time?

A:     He said it at least once or twice.

[Vol. 36 RR: 146 - 148].

10.     Momoh's testimony regarding the statements allegedly made by Petitioner inculpating himself in the murders conflicts with her previous tape recorded statement to the Tuscaloosa Police Department on June 22, 1992, in which she did not state that Petitioner had made these inculpatory statements to her and denied that Petitioner made any statement to her about his the killings.

11.     Momoh testified on cross-examination the day following her direct testimony.  She explained that she had been held in Harris County Jail on contempt of court for refusing to testify.  She stated that her testimony on direct examination by

the State was "coerced," and she had tried to invoke her Fifth Amendment privilege because parts of her June 26 statement were inaccurate. She also explained that she had tried to notify the State through her attorney that her June 26 statement was inaccurate.

12.    Discussing the circumstances in which she gave the June 26 statement, Momoh explained that she went to the Houston Police Department with her sisters Grace and Serisa Brown and a friend, Kirk Royster. After arriving there, the detectives separated her from her companions and kept isolated in a small interrogation room for several hours. During the following hours, her interrogators were verbally abusive and threatening, rambling, pounding the furniture, and directing derogatory statements at her. She was never advised of her rights, nor told she had the right to an attorney. The detectives did not offer to tape record the interrogation session. One of the detectives, Novak, accused her of lying on her June 22 tape recorded statement to the Tuscaloosa police. She did not feel free to leave. Rather, the detectives advised her that they were holding her and would keep her until she gave a statement and "got it right." Throughout the interrogation, she was threatened with incarceration: Detective Novak threatened her with a federal warrant, and indicated to her that her missing .38 caliber handgun was one of the murder weapons and that she could go to jail for that fact. The detectives also made reference to her

custody dispute with her ex-husband, suggesting that they could facilitate her losing custody of her children.   After several hours of this treatment, Momoh signed a statement typed up by one of the detectives, after which she was released.

13.   Concerning her prior testimony, Momoh explained that prior to her testifying on direct examination, she had been threatened with contempt for up to 6 months in the Harris County jail if she refused to testify and that her decision to testify resulted from her desire to avoid further incarceration.[4]

15.   Momoh explained that the June 26 statement contained "inaccuracies." One inaccuracy was that Petitioner never told her about having shot anyone. However, this supposed admission was one of the details that the HPD Detectives "wanted [her] to get right."   Also, Petitioner did not say he was "tired of all the killings."   He never told her that he was responsible for the killings.   Another inaccuracy is the allegation that Malik Travis and Marion Dudley woke her up and got her to drive them to the airport.   Instead, she does not know when they left.

---

[4]   In a bill of exceptions,  Momoh testified that she understood the State's position to be that her July 26 statement was true and that one of the trial prosecutors threatened her through counsel that if she did not testify in accordance with her June 26 statement, she would be charged with aggravated  perjury. She explained that she would not have testified consistently with her June 26 statement had she not been incarcerated on contempt and threatened with aggravated perjury charges.  She believed during direct examination by the State that if she did not testify in accordance with her June 26 statement, the State would prosecute her for aggravated perjury.

15.     On redirect by the State, Momoh explained before the jury that she had testified in accordance with the June 26 statement both outside the jury's presence and on direct examination because she believed that she had to testify in accordance with that statement to avoid charges of criminal contempt and aggravated perjury.

16.     Within a week of Petitioner's verdict, the State charged Momoh with Aggravated Perjury in *State of Texas v. Carolyn Momoh*, No. 680653, in the 179th District Court of Harris County, Texas.  The indictment alleged that one of Momoh's statements during trial was false.  Momoh pleaded guilty and was placed on misdemeanor deferred adjudication probation on January 19, 1994.

17.     During the post-conviction writ investigation, investigator/mitigation specialist Lisa Milstein traveled to Tuscaloosa, Alabama, and met with Momoh to discuss her testimony at trial.  Momoh repeated her testimony on cross-examination, stating that her testimony about Petitioner's admissions to her had been false.  She explained to Milstein that she was interrogated by Houston Police Department detectives for several hours on June 26, 1992, which resulted in her signing a sworn statement prepared by the detectives.  Her interrogators provided her with information about Petitioner which they wanted her to put into the statement.  This information included:  (a) an alleged statement that Petitioner made to her that he had shot or killed six Mexicans; (b) Petitioner's agreement with  Momoh to pay her a specified

sum of money for driving his rental van back to Alabama; and ( c )  her knowledge that the van contained drugs.  She informed the police that this information was incorrect, but they coerced her into swearing to the affidavit.  These coercive tactics included threats of being placed in jail and warnings about her losing custody of her children, who were the subject of her pending divorce.  The detectives advised her that her sister Serisa had made incriminating statements about Petitioner and that Momoh's statement had to match up.

18.    Momoh also told Milstein about what happened to her at trial.  She initially refused to testify in accordance with the allegations within her sworn statement because they were false.  As a result, she was  incarcerated for contempt, and an attorney, George Parnham, was appointed to represent her.  Parnham advised her that she would be released from jail if she agreed to testify on behalf of the State in accordance with her statement.  She refused, and her mother paid Parnham to file an appeal on her behalf.  After being released from jail, she again refused to testify in accordance with her June 26 statement, and she was again incarcerated.  She spoke with her mother, who advised her to cooperate with the State so she could be released from jail and return to Alabama to care for her children.  In light of these pressures, Momoh relented and testified as she believed the State wanted her to testify.

19.     Momoh's statements concerning aggressive and abusive police tactics during the HPD interrogation were corroborated during Milstein's interviews of Momoh's sisters, Grace and Serisa Brown.  Grace accompanied Momoh to the Houston Police Department.  While at the police department, Grace was herself threatened by the police with prosecution if she did not give a statement containing details corroborative of those allegedly given by her sister, Serisa.  She later learned from Serisa that the police had threatened her with removal of her children unless she gave a statement.  In order to terminate the interrogation and leave, Grace relented and signed the statement the police provided.  Serisa also recounted her interrogation by the Houston Police.  Serisa stated that during her June 26 interrogation, the detectives were verbally abusive and threatened her with prosecution and with taking custody of her children unless she "got it right."  Because of these threats, Serisa acquiesced to a statement prepared by the police.  The police asked her leading questions, with her giving the suggested responses, rather than her giving a narrative recital.  According to Serisa, most of what she agreed to was false.  Serisa agreed to the statement as a result of the threats made against her.

20.     Because she refused to testify and was jailed for contempt, Momoh did not testify during the State's case-in-chief.  Instead, she testified as a rebuttal witness after Petitioner put on his defense.  However, her testimony about Petitioner's alleged

statements admitting to his participation in the killings had a demonstrable effect upon the jury's guilt verdict. At least two jurors told the media that Momoh's testimony "was damning" and resolved residual doubts. *See* Wendy Reeves, <u>Texas Jury Says Killer Must be Executed</u>, The Tuscaloosa News, at 4A (November 23, 1993).

**The State Court's Disposition of the Claim**

The Court of Criminal Appeals rejected this claim on direct appeal, and, as a result, the State's proposed fact-findings, signed by the state habeas court, asserted that the court did not have to consider the claim again on state habeas. On direct appeal, the court noted that all the discussions about whether Momoh happened in open court with the trial court, the prosecution, and the defense attorneys present. As such, the court found that Petitioner failed to show any misconduct or coercion on the State's part. *Brown, slip op. at 39-40.* On habeas, the court expanded on this holding and held that Petitioner failed to show harm in the event that the State presented false testimony.

**Legal Basis of Claim**:

Petitioner incorporates by reference the legal analysis set forth in the first two grounds for relief as if set forth fully here. Because of the severe limitations in funding, the state habeas court failed to provide a full and fair hearing on Petitioner's

claim, even though he set forth facts that if true, would entitle him to relief. Petitioner urges the Court to hold a hearing so he can present evidence in support of the claim.

Petitioner has been denied Due Process of Law under the 5th and 14th Amendments to the United States Constitution by the State's knowing and intentional presentation of false and misleading testimony by Momoh in accordance with her June 26, 1992, written statement to the Houston Police Department. *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935).

Similarly, in light of Momoh's notice that she would recant her June 26 statement and invoke her 5th Amendment privilege to avoid a perjury charge from that revocation, by calling Momoh for the express purpose of impeaching her recantation, the State violated Petitioner's right to Due Process of Law through its improper manipulation of state evidentiary rules. *See, Lisenba v. California*, 314 U.S. 219, 236 (1941); *Patterson v. New York*, 432 U.S. 197, 202 (1977).

Further, through the warnings of prosecution and from the imposition of criminal contempt upon Ms. Momoh in light of her recantation and invocation of her 5th Amendment privilege, the State violated Petitioner's right to due process of law by coercing Momoh into adopting her June 26 statement. *See generally Webb v. Texas*,

409 U.S. 95, 97-98 (1972); **United States v. Serrano**, 406 F.3d 1208, 1215 - 1216 (10th Cir. 2005); *and*, **United States v. Dupre**, 117 F.3d 810, 823 (5th Cir. 1997).

Given the limitations on factual development during the state post-conviction proceedings, both resulting from the denial of funding to develop additional extra-record facts relating to the claim prior to filing the state post-conviction writ application, and the denial of an evidentiary hearing following the filing of the post-conviction writ application, the adjudication of Petitioner's claim by the state habeas court, and adopted by the Texas Court of Criminal Appeals, is an unreasonable determination of the evidence presented in the state court proceedings.  28 U.S.C. § 2254(d)(2).  Through post-conviction investigation, Petitioner sought to investigate and develop additional facts relating to the claim which would have presented the claim in a significantly different, and much stronger basis, than existed in the state record. For this reason, § 2254(e)(2)(A)(ii) compels additional fact-finding procedures and an evidentiary hearing.


13.  If any of the grounds listed in section 12 were not previously presented in any other court, state or federal, state briefly what grounds were not so presented, and give your reasons for not presenting them.  _____
_____ .

14.  Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ___    No **X**

15.  Give the name and address, if known, of each attorney who represented in the following stages of the judgment attacked herein:

    (a)    At preliminary hearing: _____

    (b)    At arraignment and plea: **Ms. Patricia Nasworthy Saum, P.O. Box 530990  Grand Prairie, TX, 75053,** and **Mr. Thomas Moran, 440 Louisiana St, Ste. 800Houston, TX, 77002**

    (c)    At trial: **Same as above**

    (d)    At sentencing: **Same as above**

    (e)    On appeal: **Mr. Thomas Moran, 440 Louisiana St, Ste. 800 Houston, TX, 77002**

    (f)    In any post-conviction proceeding: **Mr. Alexander L. Calhoun, 3301 Northland Dr., Ste. 215, Austin, TX 78731** .

    (g)    On appeal from any adverse ruling in a post-conviction proceeding: **N/A** .

    (h)    In the original federal proceeding: **Mr. Alexander L. Calhoun, 3301 Northland Dr., Ste. 215, Austin, TX 78731**, and **Mr. Paul Mansur, P.O. Box 1300, Denver City, TX, 79323** .

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at the same time?

Yes ___    No **X**

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ___    No **X**

(a)    If so, give the name and location of court which imposed sentence to be served in the future: _____.

(b)    And give date and length of sentence to be served in the future: _____.

(c)    Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ___    No ___

WHEREFORE, Petitioner prays that the Court permit filing of this preliminary/skeletal petition with leave to file an amended or supplemental petition, to deem said amended petition to be the original petition, and upon consideration of said petition to grant such relief to which Petitioner may be entitled.

Respectfully Submitted,

Law Office of Alexander L. Calhoun
3301 Northland Dr., Ste. 215
Austin, Texas 78731
Tele: (512) 420-8850
Fax:  (512) 233-5946
Cell: (512) 731-3159
Email:    alcalhoun@earthlink.net


By:  /s/ Alexander Calhoun _____
     Alexander Calhoun
     COUNSEL FOR ARTHUR BROWN, JR.
     Texas Bar No.:  00787187

Paul E. Mansur
Attorney At Law
P.O. Box 1300
Denver City, TX, 79323
Tele:  (806) 592-2797
Email:

By:  /s/ Paul E. Mansur
       Paul Mansur
       COUNSEL FOR ARTHUR BROWN, JR.
       Texas Bar No.:  00796078

## Verification

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.

Dated:  January 12, 2009       /s/ Paul E. Mansur
                           Paul E. Mansur

## Certificate of Service

I certify that on January 12, 2009, I served, by email, a true and correct copy of this Petition for Writ of Habeas Corpus by a Person in State Custody upon opposing counsel at the following address:

Greg Abbott
attn:  Ed Marshall or assigned assistant AG
Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548

               /s/ Paul E. Mansur
               Paul E. Mansur