UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ARTHUR BROWN, JR, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. H-09-74 |
| | § | |
| RICK THALER, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Arthur Brown Jr. ("Brown"), an inmate on Texas' death row, has filed a petition seeking federal habeas corpus relief. (Instrument No. 1). Rick Thaler ("Respondent") has filed an answer and motion for summary judgment. (Instrument No. 23). This Court has considered the pleadings, record, and law – particularly the relevant provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). For the reasons discussed at length below, the Court finds that Brown has not shown an entitlement to federal habeas corpus relief. Accordingly, the Court will grant Respondent's summary judgment motion and deny Brown's habeas petition. The Court will not certify any issue for appellate review.

## BACKGROUND

The State of Texas charged Brown with capital murder for his involvement in the execution-style killing of four people. Brown stood trial in the 351st District Court for Harris County, Texas, with the Honorable Judge Lupe Salinas presiding. On direct appeal, the Texas Court of Criminal Appeals outlined the relevant facts of this case:

> On the evening of June 20, 1992, at the Houston home of Rachel Tovar, six people were shot, four of whom died. Rachel Tovar was one of the survivors of the assault. In the hospital immediately after the incident, Tovar gave a recorded oral statement in which she stated that "Squirt" was one of the perpetrators and described the van he and his friends were driving. She subsequently identified

[Brown] in a photospread. At trial Tovar identified [Brown] as the man she had referred to as "Squirt." Others also testified that [Brown] was known as "Squirt." Tovar further testified that she and her husband had sold marijuana and cocaine to [Brown] on several occasions. Tovar testified that on the day of the offense [Brown] and his friends came to her house about 2:00 or 3:00 in the afternoon to discuss the purchase of some cocaine and that they were driving a beige minivan. They left and returned around 6:00 p.m., and then left again only to return to the house a couple of hours later, at which time the shootings took place. Tovar testified that [Brown] bound her and five others who were in the house with strips of bedsheets [Brown] cut with a knife. The bound individuals were then placed in various rooms throughout the house. She heard gunshots from the other rooms and then she was shot. Tovar testified that she did not know who shot her, although she saw each of the three perpetrators with a gun at various times during the assault.

The other survivor, Nicholas Cortez Anzures, testified that he had gone to visit the Tovars' at about 10:00 p.m. on the evening of the murders. He stated that he drove to the Tovars' house with some friends who waited for him in the car outside. He knocked on the door and was forced inside by [Brown] who was pointing a gun at the head of one of the victims. Cortez was taken to a back room by [Brown] and one of his cohorts, where he was bound and gagged. Cortez testified he heard a woman scream and shots from the front of the house. Then "the man with the chrome gun" and [Brown] came into the room and the man with the gun shot Cortez and another victim.

Candelario Hernandez testified that he drove with Cortez to the Tovars' house and waited in the car, expecting Cortez to return to the car quickly so that they could proceed to a party they planned to attend. Shortly after Cortez went inside Hernandez heard two sets of shots coming from the house and observed two black men exit the front door, get into a minivan, and drive away.

Rachel Tovar's neighbor testified that he was sitting in his front yard the night of the offense. He observed a van parked outside the Tovars' house and saw a black man going back and forth between the van and the house and putting something in the van. He further testified he heard three "popping sounds" and then the van left. Shortly thereafter Rachel Tovar emerged from the house injured and calling for help.

Still another person, Daniel Leija, testified to having been at the Tovars' house earlier in the evening and seeing [Brown] there. He also testified that he had seen a van parked in front of the house.

[Brown's] three sisters, Serisa Brown, Grace Brown and Carolyn Momoh, were all called as witnesses for the State. At the time of the offense, Serisa and her child and Carolyn and her two children were living with Grace at Grace's house in Houston. The sisters all testified that [Brown] and three of his friends, Marion

Dudley, Tony Dunson, and Maliek Travis, came to Grace's house in the early morning hours of June 20th. [Brown] and his friends were driving a tan minivan with Alabama plates. They left and returned several times that day and evening. Sometime after midnight that night [Brown] asked Serisa and Carolyn to drive the van back to Tuscaloosa, Alabama for him the next morning. He agreed to pay each of them $1,000 in return for driving the van. Serisa and Carolyn took [Brown] to the airport the morning of June 21st and then the two women and their children left for Tuscaloosa in the van. Upon arrival in Tuscaloosa, Carolyn spoke with Grace by phone who informed Carolyn of a news report she had seen pertaining to the murder of several persons and stating that a van with Alabama plates was identified as having been at the scene. Carolyn and Serisa turned the van over to [Brown] and his friends in Tuscaloosa and collected their money. Carolyn and Serisa eventually gave statements to Alabama authorities, and all three of the sisters gave statements to the Houston police on June 26th.

*Brown v. State*, No. 71,817 at 31-33 (Tex. Crim. App. Dec. 18, 1996) (footnotes omitted) (hereinafter "Opinion on Direct Appeal").

A grand jury indicted Brown for "intentionally and knowingly caus[ing] the deaths of more than one person during the same transaction, namely, the deaths of JESSICA QUINONES, JOSE GUADALUPE TOVAR, AUDREY BROWN, AND FRANK FARIAS, hereafter referred to as the Complainants, by shooting the Complainant's [*sic*] with a deadly weapon, namely a firearm." Clerk's Record at 5, 7.[1] The trial court appointed Patricia Saum and Tom Moran to represent Brown.[2]

A unanimous jury found Brown guilty of capital murder. The prosecution and defense presented evidence relevant to Brown's sentence in a separate punishment hearing. The jury decided Brown's sentence by answering three special issue questions:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a

---

[1]     The state court proceedings in this case resulted in a voluminous record. The Court will cite the trial record containing trial court motions and docket entries as Clerk's Record at ___. The reporter's record containing the trial proceedings will be cited as Tr. Vol. ___ at ___. The Court will refer to the record from Brown's state habeas proceedings as State Habeas Record at ___.

[2]     Unless necessary to identify one member of the trial team, the Court will refer to Brown's trial attorneys collectively as "trial counsel." Ms. Saum has since married and the affidavit she submitted in state habeas court bears the surname Nasworthy. The Court will refer to her as Ms. Saum to preserve continuity with the trial record.

probability that the defendant, Arthur Brown, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that Arthur Brown, Jr., the defendant himself, actually caused the death of Jessica Quinones and Jose Guadalupe Tovar and Audrey Brown and Frank Farias, on the occasion in question, or if he did not actually cause their deaths, that he intended to kill Jessica Quinones or another, or that he anticipated that a human life would be taken?

Special Issue No. 3

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury, however, need not agree on what particular evidence supports an affirmative finding on this Special Issue.

Clerk's Record at 520-22. The jury answered the special issues in a manner requiring the imposition of a death sentence.[3]

In 1995, Brown filed an appeal to the Texas Court of Criminal Appeals raising forty-seven grounds for relief. The Court of Criminal Appeals affirmed Brown's conviction in a lengthy opinion. The United States Supreme Court denied certiorari review. *Brown v. Texas*, 522 U.S. 940 (1997). Justice John Paul Stevens, however, wrote an opinion respecting the denial of certiorari which three other Justices joined.

In 1998, Brown filed an application for a state writ of habeas corpus. A decade later, the lower state habeas court signed the State's proposed findings of fact and conclusions of law. State Habeas Record at 281-307. In a brief order, the Court of Criminal Appeals adopted the lower court's findings and denied relief. *Ex parte Brown*, No. WR-26178-02, 2008 WL 2487788

---

[3]     In a separate trial, Brown's co-defendant Dudley received a death sentence for his participation in the crime. *Dudley v. Dretke*, 77 F. App'x 741 (5th Cir. 2003). The State of Texas also filed capital murder charges against Dunson but did not seek a death sentence. *Dunson v. State*, 1997 WL 732500, 1 (Tex. App. –Hous. 1st 1997).

(Tex. Crim. App. 2008).[4]

This Court appointed counsel to prepare and litigate a federal petition for a writ of habeas corpus. Brown's petition raises the following claims:

1.    The state habeas court violated his constitutional rights by denying funds for additional investigative services and by prohibiting access to forensic evidence. (Claims 1, 2, and 7).

2.    Trial counsel provided ineffective assistance by inadequately investigating and presenting mitigating evidence. (Claim 3).

3.    The trial court violated his constitutional rights by prohibiting the discussion of parole eligibility during jury selection, at the punishment phase, and in the jury instructions. (Claims 4 through 6).

4.    The prosecution knowingly presented false testimony through a ballistics expert and his sister, Carolyn Momoh. (Claims 8 and 9).

Respondent has moved for summary judgment, arguing that all Brown's claims are procedurally defective or substantively meritless. (Instrument No. 23). Brown has filed a response to the summary judgment motion. (Instrument No. 28). In that pleading, Brown concedes that claims 1, 2, and 7 do not present cognizable grounds for federal habeas relief. (Instrument No. 28 at 19). He asks the Court, however, to consider the arguments he makes in those claims when adjudicating his other grounds for relief. He also asks the Court to allow additional factual development to support his claims.

---

[4]    The brief order stated, in relevant part:

In this writ application, applicant presents seven allegations in which he challenges the validity of his conviction and the resulting sentence. A hearing was not held, but the trial court did enter findings of fact and conclusions of law recommending that relief be denied.

This Court has reviewed the record with respect to the allegations made by applicant, and based upon our own independent review of the record, relief is denied. We further agree with the trial court's findings and conclusions regarding applicant's claims numbers three through seven, and adopt these findings and conclusions as our own.

*Ex parte Brown*, 2008 WL 2487788, at *1 (Tex. Crim. App. 2008). The Court of Criminal Appeals did not adopt that potion of the lower court's findings and conclusions which addressed Brown's contention that the denial of habeas investigative funds rendered his habeas counsel ineffective. The Court does not rely on that section of the lower court's order in adjudicating Brown's claims.

## STANDARDS OF REVIEW

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 780 (2011).  Federal habeas corpus review provides an important, but limited, examination of state criminal judgments.  "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982) (quotation omitted); *see also Richter*, ___ U.S. at ___, 131 S. Ct. at 787 ("[T]he basic structure of federal habeas jurisdiction [is] designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions."); *Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).  The AEDPA, which "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, ___ U.S. ___, 130 S. Ct. 1855, 1862 (2010) (quotations omitted), codifies traditional principles of finality, comity, and federalism that underlie the limited scope of federal habeas review.

Under the AEDPA, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2258 (2010) (quoting 28 U.S.C. § 2254(d)(1)).  A habeas petitioner may only obtain relief (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of

the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, ___ U.S. ___, 130 S. Ct. 1171, 1174 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Simply put, the AEDPA "prevents defendants – and federal courts – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Lett*, ___ U.S. at ___, 130 S. Ct. at 1866.[5]  "If this standard is difficult to meet, that is because it was meant to be." *Richter*, ___ U.S. at ___, 131 S. Ct. at 786.

A petitioner's compliance with the AEDPA alone does not entitle him to habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003).  Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, restrict federal habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  This Court cannot issue the writ issue unless error "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome.").  Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new

---

[5]      In other words, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, ___ U.S. at ___, 131 S. Ct. at 786.

constitutional law.  *See Horn*, 536 U.S. at 272.

Respondent has moved for summary judgment.  Summary judgment is proper when the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  In ordinary civil cases, a district court considering a motion for summary judgment must construe disputed facts in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  However, a court on summary judgment must view the evidence through "the prism of the substantive evidentiary burden."  *Anderson*, 477 U.S. at 254.  Congress, through the AEDPA, has constricted both the nature and availability of habeas review.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) ("[Rule 56] applies only to the extent that it does not conflict with the habeas rules."), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

The AEDPA's significant deference to a state court's resolution of factual issues guides summary judgment review in habeas cases.  Brown presented his claims in state court.  The state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted claim.  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  See 28 U.S.C. § 2254(e)(1).

The Court has reviewed the record and pleadings and finds that an evidentiary hearing is not required and not necessary for the adjudication of Brown's claims.

## ANALYSIS

### I.    Trial Counsel Provided Ineffective Assistance by Inadequately Investigating and Presenting Mitigating Evidence. (Claim 3)

Trial counsel presented an abbreviated case in the punishment phase.  In state habeas court Brown argued that trial counsel failed to call readily available witnesses who would have given the jury a sympathetic view into his difficult childhood and troubled background.  Brown summarizes his attack on trial counsel's mitigation strategy as follows:

> The defense did not make use of an investigator or mitigation specialist to undertake an investigation of the case or [Brown's] background or character. Furthermore the defense did not use any experts, such as doctors, psychologists, or the like, to assist in developing a mitigation case, and it is apparent that they did not request such expert assistance. Finally the evidence in the record that the defense team did much of anything to investigate mitigation is scant at best.

(Instrument No. 1 at 31-32).   Brown's evidence would apparently center on a turbulent childhood, marked by his mother's alcohol abuse and unstable relationships.  In addition, Brown alleges that trial counsel should have retained mental-health experts to evaluate his low intelligence and explore whether he suffered from Fetal Alcohol Spectrum Disorder.   Brown emphasizes, however, that trial counsel's failure to call lay witnesses, including his sisters and his mother, violated his constitutional rights.

A.    The *Strickland* Standard

A reviewing court must assess counsel's representation under the standards established in *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Under *Strickland*'s two-pronged test, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the

defense." *Yarborough v. Gentry*, 540 U.S. 1, 3, (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct," *Wiggins*, 539 U.S. at 521, but instead "measure[s] . . . attorney performance" for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  This "highly deferential" review eliminates "the distorting effect of hindsight" by looking at "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689-90.

A petitioner must also show actual prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.  In assessing prejudice, "*Strickland* places the burden on the defendant, not the State[.]" *Wong v. Belmontes*, ___ U.S.___. 130 S. Ct. 383, 390-91 (2009).  The Court does not consider prejudice in a vacuum; "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700.

"Surmounting *Strickland*'s high bar is never an easy task," especially when considered under the AEDPA's deferential review. *Padilla v. Kentucky*, ___ U.S. ___, 130 S. Ct. 1473, 1485 (2010).  The question of "whether the state court's application of the *Strickland* standard was unreasonable . . . is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785; *see also Schaetzle v.*

*Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003); *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004). "A state court must be granted deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Richter*, ___ U.S. at ___, 131 S. Ct. at 785.

With those standards in mind, the Court will review the case before the jury, what testimony Brown claims trial counsel should have adduced, and whether he has met the *Strickland* standard.

B.      Trial Counsel's Preparations and the Punishment Phase of Trial

The penalty phase of trial lasted one day.  The defense presented only a brief case to mitigate a sentence of death and did not call any lay witnesses.  The state habeas court, however, noted that trial counsel's cross-examination of Brown's sisters in the guilt/innocence phase discussed mitigation evidence.  The state habeas court summarized that evidence as follows:

> [D]uring the guilt-innocence phase of [Brown's] trial, Serisa Brown testified during cross-examination by trial counsel that she met [Brown's] attorney a month prior to testifying when trial counsel was in Alabama for four days; that trial counsel also met with [Brown's] other sisters, Grace Brown and Carolyn Momoh, and [Brown's] mother and father; that [Brown] had thirty-two brothers and sisters; that [Brown's] mother was present in the courtroom during the trial; that [Brown] was twenty-three years old; that [Brown] had three children; and that [Brown] was close to Oneitha Gay, the mother of his children who lives in Alabama.

State Habeas Record at 293.  Trial counsel also introduced Brown's school records into evidence.  Tr. Vol. 40 at 103-04.

As the defense's lone punishment-phase witness, trial counsel called an expert to refute the State's argument that Brown would be a future threat to society.  Peter Lewis, a professor at the South Texas College of Law with a Ph.D. in criminology, described "maturational reform," the theory that youthful offenders become less violent over time.  Dr. Lewis discussed how maturational reform has a greater impact on violent offenders, like Brown, than non-violent

offenders.  Tr. Vol. 40 at 96-98, 102.

After presenting Dr. Lewis' testimony, trial counsel approached the bench and informed

the trial court:

> What I wanted to put on the record is that I asked Ms. Brown, Mr. Brown's
> mother, to stay and to testify – Arthur Brown's mother.  She went to visit in the
> jail this weekend and he told her to go home.  He did not want to put her through
> it and so it is his request that she not be here as a witness.  I may need to get him
> to say that on the record outside the presence of the jury.  I just wanted to let you
> know before I rested.  I wanted to put it on the record.

Tr. Vol. 40 at 106.  Brown affirmed on the record that he did not want to call his mother as a

witness.  Tr. Vol. 40 at 109.  Trial counsel acknowledged the presence of other family members

but chose to rest the defense's case.  Tr. Vol. 40 at 109.

Ms. Saum began her closing argument by telling the jury: "I apologize if any of y'all

wanted to hear from [Brown's] family and you didn't get to because I didn't put anybody on.  I

don't see how putting anyone on from [Brown's] family is going to help you make a decision.

Because anyone who would testify would tell you don't kill my son."  The State objected, but

Ms. Saum told the jury "you can infer what you would say if it were your child. . . ."  Tr. Vol. 40

at 125.  Ms. Saum then discussed each of the special issues, arguing that the jury should find that

Brown was not eligible for a death sentence.  Ms. Saum provided only a brief argument relating

to mitigating evidence:

> I'm going to ask you when you're considering the mitigating circumstances to go
> back and look at Defendant's Exhibit No. 132.  They are the school records of
> Arthur Brown.  They will tell you something about Arthur Brown and his
> background and his special education and when he dropped out of school and what
> kind of learning disability he had.  And those again are things that you can
> take into consideration in determining his background and his moral culpability.
>
> Once again, there's not a lot that anyone can say at this point.  You have made a
> decision that based on the evidence that you heard that you believe that Arthur
> Brown is guilty of capital murder.  Now, you have to go back with the same
> burden of proof and answer Special Issue No. 1, Special Issue No. 2, and you

don't have a burden of proof on Special Issue No. 3.  I would ask that you consider all of the evidence and I would ask you that you think about the circumstances of the offense and consider that when you have capital murder there's a wide range of ways that it can be committed.

If you have victims that were just walking down the street and didn't have any criminal acts that they were committing themselves, that could subject them to life in prison.  That that might be a different consideration as far as circumstances, but that the circumstances in this case surrounding the crime are significant.  And I would ask you to consider them and I would ask you to answer Special Issue No. 1 no and Special Issue No. 3 yes, that [there] are  mitigating circumstances.

Tr. Vol. 40 at 132.[6]

The State, however, rebutted the defense's reliance on school records by arguing: "He's got an 80 IQ. There's no reason he can't function.  There's no reason he can't conform his behavior to the requirements of society other than he doesn't care."  Tr. Vol. 40 at 136.  The State also forcefully refuted the argument that anything in his background or character was mitigating, but emphasized instead "he's an armed robber . . . a major drug dealer in Tuscaloosa, Alabama.  That's his background.  That's his character."  Tr. Vol. 40 at 136.  The jury answered the special issues in a manner requiring a death sentence.

>    C.    State Habeas Process and the Application of AEDPA Deference

Brown draws the Court's attention to his state habeas proceedings and argues that Texas did not give him adequate resources to develop mitigating evidence after trial.  The state courts appointed counsel to represent Brown on state habeas review.  Brown sought for, and received, authorization to retain investigative assistance amounting to $2,500 at a rate of $50 an hour.  Brown retained Lisa Milstein, a private investigator and mitigation specialist with experience in capital habeas cases. Ms. Milstein's investigation required her to interview witnesses and examine evidence in both Houston, Texas and Tuscaloosa, Alabama.

---

[6]    Mr. Moran's closing argument focused on Dr. Lewis' testimony and Brown's future threat to society.  Tr. Vol. 40 at 118-124.

In relevant part, her investigation included a trip to Tuscaloosa where she interviewed friends and family members. From her interviews, she notarized an affidavit from Brown's mother which reads in its entirety:

> I am Arthur Brown's mother. While pregnant with my son, Arthur, I drank every weekend. Sometimes I drank during the week. On the weekends I drank at least 1 pint of either whiskey or brandy. My husband, sisters, and mother can verify my drinking.
>
> I drank like that up until my son's trial. I have not had a drink since then. I know my drinking affected my children.
>
> When I was 4 or 5 months pregnant with Arthur I almost lost him. My doctor was unaware of my drinking. My doctor thought it was from my being on my feet and lifting at work. I worked in the kitchen at University of Alabama. I started hemoraging [*sic*], so my doctor put me in bed for the remainder of my pregnancy.

State Habeas Record at 179.

Ms. Milstein did not obtain affidavits from anyone else. Instead, she wrote out a statement in which she described her investigation and summarized the substance of her conversations with Brown's family members.[7]  In the section which she described her interview with Brown's mother, Ms. Milstein emphasized the heavy drinking outlined in her affidavit. Brown's mother also recalled one early childhood head injury resulting in a concussion.

Ms. Milstein's statement emphasized her conversations with Serisa Brown, Grace Brown, and Carolyn Momoh, Brown's three sisters who testified for the State in the guilt/innocence phase. Together, the statements Ms. Milstein attributed to Brown's sisters chronicle a turbulent childhood deeply impacted by their parents' divorce and their mother's alcohol abuse. Those negative factors contrast with the stable relationship Brown had with his common-law wife and three children for whom he provided for by working two jobs. Trial counsel allegedly did not talk with the sisters about Brown's childhood or background.

---

[7]  Ms. Milstein did not mention any information from Brown's father and brother, but focused on statements she attributed to his mother and sisters.

Ms. Milstein's statement also sketched out additional information she wanted to develop regarding Brown's background.   This proposed research would have verified his mother's drinking, explored the possibility that Brown suffered from Fetal Alcohol Spectrum Disorder, corroborated the sisters' accounts of police manipulation, investigated the possibility that drug rivals may have had part in the murders, and included an interview with Brown's common-law wife.   State Habeas Record at 119-31.   However, the Texas courts did not provide resources to support that investigation.

According to Brown, Ms. Milstein cut short her investigation because she ran through the approved funding and, in fact, exceeded the authorized funds by $292.34.   Brown sought additional funds from the Court of Criminal Appeals for additional investigation and to cover Ms. Milstein's overage.   The Court of Criminal Appeals agreed to reimburse Ms. Milstein, but denied additional funds for investigation.[8]   With the denial of funds, Brown's state habeas investigation ended.   Brown continued to protest the limited authorized funds throughout the state habeas process.   The state habeas court did not hold an evidentiary hearing to allow factual development.

Brown raises as constitutional grounds for relief several arguments relating to alleged insufficiencies in the state habeas process.   Conceding that those arguments do not provide a cognizable basis for relief (Instrument No. 28 at 19), Brown nonetheless contends that deficiencies in state review modify the nature and breadth of federal review. Relying on various federal constitutional provisions, Brown argues that, because he showed an adequate need for additional investigation, the state courts had an obligation to approve a full and fair inquiry into his allegations.   Brown asserts that this Court must review his ineffective-assistance-of-counsel

---

[8]     The Court of Criminal Appeals did not explain why it denied Brown additional investigative funds.  Only speculation attributes that denial to a budget shortfall or to a substantive skepticism about the results of additional investigation.

claim *de novo* and allow him additional opportunities to develop the factual basis for his claim.

Federal courts do not favor challenges to the sufficiency of the state habeas process. The Constitution does not require a State to offer habeas corpus review and provides no due process protection to those proceedings if a State provides a habeas avenue of relief. *See Murray v. Giarratano*, 492 U.S. 1, 7-8 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987); *Hogue v. Johnson*, 131 F.3d 466, 494 (1997). Infirmities in a State's habeas process, therefore, are not actionable on federal review. *See Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005); *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992). Still, Brown argues that the nature of the state habeas review in this case should force full federal factual development which gives no heed to the state habeas adjudication.

Respondent makes three arguments to bar additional factual enhancement and to honor the state habeas ruling. First, Respondent relies on the federal exhaustion doctrine, 28 U.S.C. § 2254(b)(1), to argue that federal law bars additional factual development. While the exhaustion doctrine does not disallow amplification of issues already fleshed out in state court, *see Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003), federal courts approach new evidence on federal habeas review with caution. Brown seemingly both wishes to expand the record and fundamentally alter the claim he raised in state court. While he presented some evidence on state habeas, much of his anticipated mitigation defense was not before the state courts, such as his recent efforts to support his claim of suffering Fetal Alcohol Spectrum Disorder. [9]

---

[9]     Brown did not emphasize the development of expert testimony in state habeas court. For the first time in his reply to the pending summary judgment motion, Brown has filed supporting material for his argument that counsel should have sought expert assistance to determine if he suffered from Fetal Alcohol Spectrum Disorder. Dr. Natalie Novick Brown has submitted a declaration wherein she states that "**there is abundant preliminary information to support a conclusion that an FASD diagnosis is LIKELY and that a multidisciplinary diagnostic assessment to address this issue should be undertaken.**" (Instrument No. 28, Exhibit A) (emphasis in original). Aside from obvious concerns about the exhaustion

Second, and more persuasively, Respondent refutes the underlying premise that the Court of Criminal Appeals' initial authorization failed to provide sufficient resources for a full and fair inquiry into available mitigation evidence.  Ms. Milstein interviewed several individuals but only secured an affidavit from Ms. Brown.  Even then, Ms. Brown's affidavit only addresses a portion of the information Ms. Milstein attributed to her.  Ms. Milstein has not explained why she did not secure affidavits from the people she interviewed instead of recounting hearsay recitations in her own statement.  As noted by Respondent, "[s]urely, an additional $2500 was not needed for these persons to simply write down what they apparently told Milstein, who is a notary public." (Instrument No. 23 at 16). This is particularly the case because "[o]btaining affidavits from family members is not cost prohibitive." *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000).

Finally, Respondent argues that Brown has not shown that additional investigation would have developed a meritorious challenge to counsel's trial strategy.  This Court's review of the merits of Brown's claim shows that he has not met *Strickland*'s performance or prejudice prong. At this stage, he has not convincingly shown that additional investigation would measurably strengthen his arguments.

The Court finds that Brown has not shown that the state habeas process inadequately allowed for investigation into his background. State habeas counsel requested a reasonable amount of funds to investigate Brown's background.  The Court of Criminal Appeals approved all the funds initially requested.  The approved expenditures only resulted in one piece of admissible evidence, but many unsubstantiated allegations.  Brown fails to explain why Ms.

---

of remedies, especially as Dr. Brown's affidavit comes before the Court so late in the habeas process, Brown has not shown that a reasonable attorney would have focused on this double-edged mitigation theory, that the Texas courts would have approved funds for the inquiry which would cost well over $20,000, or that the information would have made any difference to the sentencing jury.   As in the state habeas court's order, this Court's focus is on the lay witnesses whose putative testimony Brown supported with evidence, admissible or otherwise, in the state habeas action.

Milstein could not have acquired an affidavit to substantiate the hearsay statements she included in her report.  He has not shown why the initial expenditure of funds was insufficient to secure additional affidavits from Brown's sisters as Ms. Milstein had with his mother.  Brown's arguments would require the Court not only to supervise the expenditure of state funds, but superintend the efforts of a state-funded investigator. A review of the state process does not give much confidence that additional funds would have resulted in evidence admissible in court, or even meaningfully supporting his claim.

The AEDPA provides only one means by which a federal court can ignore state factfindings: when a petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).[10]  Even though Brown alleges that in procedure or in evidentiary rulings he did not receive a full or fair state hearing,  the Fifth Circuit has repeatedly held that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact." *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001); *see also Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004); *Bass v. Dretke*, 82 F. App'x. 351, 354 (5th Cir. 2003).  A full and fair hearing is also not a prerequisite to deference under 28 U.S.C. § 2254(d) to legal determinations.  *See Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010).[11]  This Court will honor the state factfindings and conclusions of law unless Brown

---

[10]     On its face, the AEDPA does not concern itself with the nature, quality, or depth of the state fact finding procedure.  Importantly, section 2254(e)(1) does not endorse a challenge to state factfinding based on general arguments, but requires a petitioner to submit *evidence* to overcome state fact findings.  *See Duncan v. Cockrell*, 70 Fed. App'x. 741, 745-46 (5th Cir. 2003) (differentiating between arguments against applying the presumption of correctness and evidence rebutting the presumption).

[11]     "The Supreme Court has recognized, however, that a state court's unreasonable application of federal law, as a predicate for adjudicating a defendant's claim, may undermine the AEDPA deference given to the state court adjudication."  *See Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) *see also Panetti v. Quarterman,* 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").  This is not a case where "a petitioner has made a prima facie showing" on his constitutional claim and "the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due."  *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).

meets the appropriate legal standards.

      D.      Federal Review of Trial Counsel's Efforts

The Court finds that Brown has not shown that trial counsel erred by not calling additional witnesses in the punishment phase. In response to the allegations of deficient performance, the State produced an affidavit from Ms. Saum. Ms. Saum described how she obtained information from Brown about his background: "I gave [Brown] several large legal pads and asked him to write out his entire family history for me – the good, the bad, and the ugly. [Brown] wrote out 14 single spaced sheets of information. [Brown's] writings were coherent, intelligent, and very descriptive. He was able to give me detailed information regarding his childhood, his parents, and his school years." State Habeas Record at 235.[12] With that background, Ms. Saum made two trips to Tuscaloosa. She researched Brown's criminal background, as well as that of his co-defendants and others. She spoke with his probation officer from an aggravated robbery conviction. She "met and interviewed [Brown's] sisters (Serisa Brown, Grace Brown, and Carolyn Momoh), his mother, father, and girlfriend." State Habeas Record at 236. She researched his school history, but "did not have any information that [Brown] was of sufficiently low IQ to have affected his ability to determine right from wrong." State Habeas Record at 236.

      Ms. Saum described her strategy at trial:

> When it came time to put on punishment evidence, I wanted to put [Brown's] mother on the stand to let the jury get to know [Brown] and his background and to have her ask the jury to spare his life. Much to my dismay, [Brown] requested that his mother not be called to testify. [Brown] stated to me and to the court that he did not want to put his mother through the stress of testifying. I informed the court of [Brown's] decision and, to the best of my recollection, the court verified on the

---

[12]    Ms. Saum did not enter that summary into the record because she had "not requested nor received permission from [Brown] to release this information" and assumed "that the information . . . is privileged information as both attorney-client communication and attorney work-product." State Habeas Record at 235.

record that this was [Brown's] decision. (One of the newspaper articles attached
to [Brown's] Petition for Habeas Corpus refers to this hearing outside of the
presence of the jury. . . .) [Brown's] sisters had been so shaken by their treatment
on the witness stand during the guilt phase of the trial, they did not want to testify
at the punishment phase and risk further contempt proceedings. I believe that
[Brown's] brother did testify at punishment.

My strategy during the trial was focused on guilt/innocence. With 6 persons shot
execution style and 4 of the 6 dead, including a pregnant teenager, I did not
believe that there was any punishment evidence which would mitigate in favor of
life. Due to the other drug dealers from Alabama who were in Houston at the
same time to buy drugs from the Tovar family, I hoped to put some reasonable
doubt into the record as to which drug dealers committed the crime. The jury,
however, believed the 2 surviving victims when they identified [Brown] as one of
the gunmen. One of the jurors was quoted in the newspaper as saying "There was
no reason for the shootings. When they tied those people up, the[y] could've
walked out of there with all their money, their drugs, their TV, anything they
wanted, even the pet dog, but there was no reason to shoot them. What were they
going to do, call the police and say someone just stole my cocaine and
marijuana?"

State Habeas Record at 236.

The AEDPA guides this Court's inquiry into trial counsel's representation. "When
§2254(d) applies, the question is not whether counsel's actions were reasonable. The question is
whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential
standard." *Richter*, ___ U.S. at ___, 131 S. Ct. at 788.  The state habeas court made specific and
detailed fact findings in rejecting Brown's claim.  Importantly, the state habeas court explicitly
found Ms. Saum's affidavit credible.  The state habeas court accepted Ms. Saum's explanation
that she made "a thorough investigation of the facts pertaining to guilt-innocence and
punishment, including interviewing family members for both guilt-innocence and punishment,
research[ed] [Brown's] educational history, [and] review[ed] [Brown's] criminal history[.]"
State Habeas Record at 302.  The state habeas court detailed trial counsel's investigation into
Brown's background:

trial counsel, while investigating and preparing for trial, interviewed [Brown]

about his childhood, his school years, and his family; that counsel obtained detailed information from [Brown] concerning his background; that counsel twice traveled to Tuscaloosa, Alabama where counsel reviewed police reports, obtained and researched criminal histories of [Brown], the co-defendants, and other potential suspects, researched [Brown's] extraneous offenses, met with Tuscaloosa police, viewed physical evidence, met with [Brown's] probation officer, and met with a defense attorney who shared information about a shooting which resulted in the recovery of one of the murder weapons used in the instant case. . . . investigated [Brown's] school history and learned that [Brown] had attended a total of six different schools through the tenth grade, and that trial counsel obtained contact information for potential witnesses, including a special education teacher. . . . [and] met and interviewed [Brown's] mother, father, sisters and girlfriend while visiting Tuscaloosa.

State Habeas Record at 292-93. Trial counsel's mitigation investigation turned up the same witnesses whose hearsay statements Ms. Milstein related in her declaration. Brown, however, prevented trial counsel from calling his mother to testify. The state habeas court found that Brown's sisters "had been shaken by questioning during their guilt/innocence testimony and that the sisters chose not to testify during the punishment phase for fear that they would be held in contempt." State Habeas Record at 293-94. Providing detailed reasons for its decision that the Court will discuss at length below, the state habeas court determined that Brown had not met either of the *Strickland* prongs.

In the end, the state habeas court's reasoning provided five reasons to deny Brown's *Strickland* claim. First, the state habeas court found that trial counsel employed a reasonable strategy to focus their efforts on the guilt/innocence phase. "[G]iven the horrific nature of the offense wherein six people were shot execution style, resulting in four deaths, including that of a pregnant teenager," trial counsel "elected to follow the reasonable, plausible trial strategy of concentrating effort on the guilt-innocence phase of trial, rather than punishment[.]" State Habeas Record at 295. Winnowing out weaker arguments to maintain credibility with jurors is the hallmark of effective lawyering. Here, trial counsel did not completely forgo a mitigation

defense, but focused their investigation on creating doubt in the jurors' minds that Brown had committed a particularly violent offense.  "[R]esidual doubt may be a reasonable, even highly beneficial, strategy in a capital case."  *Martinez v. Quarterman*, 481 F.3d 249, 256 (5th Cir. 2007) (explaining the holding in *Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999)); *see also Lockhart v. McCree*, 476 U.S. 162, 181 (1986); *Andrews v. Collins*, 21 F.3d 612, 623 n.21 (5th Cir. 1994); *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988).

Second, the state habeas court found that trial counsel "essentially presented some of the same information during [Brown's] trial[.]"  State Habeas Record at 295.  Notwithstanding the limited evidence about his background, trial counsel's closing "argued that [Brown's] family would have asked the jury to spare [Brown] had [Brown's] family testified; that [Brown] only had one disciplinary infraction while in jail awaiting trial; and, that [Brown] had a learning disability and was in special education classes."  State Habeas Record at 294.  Trial counsel "effectively presented mitigation evidence through the introduction of [his] school records at punishment, the testimony of defense expert Peter Lewis at punishment, and the cross-examination of [his] sisters concerning [his] background during guilt-innocence."  State Habeas Record at 304.  While some features of the presented defense certainly differed from that contained in the admissible habeas evidence, the jury still saw that Brown's background could militate against a death sentence.

Third, the state habeas court found that "trial counsel was prevented from presenting some of the same information during [Brown's] trial that [he] asserts on habeas that counsel should have presented."  State Habeas Record at 295.  Most importantly, trial counsel hoped to call Brown's mother, "as a punishment witness to testify about [Brown] and his background and to make a plea to spare [Brown's] life," but Brown asked his mother to go home because "he did

not want her to testify[.]" State Habeas Record at 293. Brown, as the master of his own defense, decided that his mother would not testify. Tr. Vol. 40 at 108-09. Brown prevented trial counsel from presenting testimony from the only individual who has provided competent evidence to support his ineffective-assistance claim. Brown's argument that trial counsel should have called his mother as a witness gains no traction. *See Moore*, 194 F.3d at 616 n.8 ("Obviously, a competent defendant may, as master of his or her own defense, elect to forgo the presentation of mitigating evidence.").

In addition, testifying had left Brown's sisters "shaken" and fearful. State Habeas Record at 294. Ms. Milstein's hearsay account of her interviews with the three sisters does not provide any light on their willingness to testify in the punishment phase. Each of Brown's sisters had testified against Brown. Through that testimony, one of the sisters (Ms. Momoh) committed perjury; Ms. Momoh later pleaded guilty to criminal charges because she lied on the stand. Trial counsel observed the sisters' earlier testimony and evaluated their contemporaneous state of mind. The sisters' prior testimony could certainly give a defense attorney pause when considering what they would add to the punishment phase. Brown has not shown that they would have testified even if trial counsel had tried to secure their recollection of Brown's background and his mother's drinking.

Fourth, the state habeas court found that trial counsel employed reasonable trial strategy in not calling some witnesses. Trial counsel explored calling one of Brown's special education teachers as a witness, but decided not to "as a matter of trial strategy, because there was no information indicating that [Brown's] IQ affected his ability to determine right from wrong." State Habeas Record at 294. To some extent, trial counsel's explanation missed the point. A low IQ score does not necessarily equate to an inability to appreciate the wrongfulness of a

defendant's actions.   Nonetheless, trial counsel here submitted Brown's school records into evidence.   While possibly not as adroitly as possible, trial counsel allowed the jury to see Brown's low intelligence.   Trial counsel's closing argument urged the jury to look at his special education background and poor school history as a mitigating factor.  Tr. Vol. 40 at 132.[13]

Finally, the state habeas court concluded that Brown had not shown *Strickland* prejudice. State Habeas Record at 304.   Even considering Ms. Milstein's hearsay-based statement and his mother's affidavit as a valid measure of what trial counsel should have presented, Brown has not shown that he has met *Strickland*'s demanding prejudice prong.   The prejudice inquiry reviews all available evidence, not just that favoring the defense.  *See Thompkins*, ___ U.S. at ___, 130 S. Ct. at 2264 ("In assessing prejudice, courts must consider the totality of the evidence before the judge or jury.").   The Fifth Circuit has indicated that a court looks to see if the petitioner's new evidence will "lessen the impact of the other evidence against him[,]"  *Conner v. Quarterman*, 477 F.3d 287, 294 (5th Cir. 2007), because "overwhelming aggravating factors" can outweigh unpresented mitigating evidence.  *Sonnier v. Quarterman*, 476 F.3d 349, 360 (5th Cir. 2007). Plugging the new mitigating evidence into the case before the jury does not suggest a reasonable probability of a different result.   Brown participated in an extremely violent attack and showed little remorse for his actions.[14]   While the trial evidence could not conclusively identify which man shot each victim, eyewitnesses saw Brown brandishing a weapon like that used in the killing

---

[13]        The jury sent out a note requesting to see the school records.  Clerk's Record at 511.
[14]        Some Fifth Circuit cases have looked skeptically on a *Strickland* prejudice review that focuses too heavily on the facts of the crime alone.  *See Walbey v. Quarterman*, 309 F. App'x 795, 804 (5th Cir. 2009) ("Without more, Texas's next argument - that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence - is a non-starter."); *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001) (criticizing "the State's stereotypical fall-back argument-that the heinous and egregious nature of the crime would have ensured assessment of the death penalty even absent the psychiatric testimony about future dangerousness-cannot carry the day here.").   While by their nature all capital-murder cases involve terrible crimes, Supreme Court precedent plainly anticipates that the severity of the crime is an important, though not unflinchingly overriding, factor in *Strickland* prejudice.  *See Smith v. Spisak*, ___ U.S. ___, 130 S. Ct. 676, 687 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime.").

and he played a major role in the crime. Brown obviously intended that six people would die, including a pregnant teenager. He had a criminal record and a history of involvement in the drug culture. His violence extended into the prison environment where he extorted other inmates and attempted violence against prison guards.

Against those aggravating factors, Brown wishes that trial counsel had adduced evidence of his troubled, impoverished, and disadvantaged background. The jury had a peek into the difficult circumstances swirling about his early life, but did not have a plenary consideration of how that affected Brown. Nonetheless, the lawlessness of his violent life ensures that the state habeas court would not be unreasonable in concluding that Brown's unpresented mitigation evidence would not end in a reasonable probability of a different result.

The state habeas court was not unreasonable in finding no *Strickland* deficient performance or actual prejudice. For those reasons, the Courts finds that the state habeas court's rejection of his *Strickland* claim was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## II.     Parole Eligibility (claims 4 through 6)

The defense repeatedly tried to bring before the jury information about the time Brown would have to serve before becoming eligible for parole. During jury selection, trial counsel asked for permission to discuss Texas parole law with the potential jurors. The trial court denied Brown's request. After a lengthy discussion, the trial court disallowed Dr. Lewis's proposed testimony about the amount of time Brown would serve if given a life sentence. Similarly, the trial court refused to instruct the jury on Texas parole law. Brown asserts that this violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. The Court of Criminal Appeals denied this claim both on direct appeal and on state habeas review. Opinion on Direct

Appeal at 4; State Habeas Record at 291-92, 301-02.[15]

Brown premises his arguments on *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994), which held that when "the alternative sentence to death is life without parole . . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court." The *Simmons* court reasoned that, when a State imposes the death penalty on the danger that the convicted individual poses to society, the fact that the defendant may receive life without the possibility of parole "will necessarily undercut the State's argument regarding the threat the defendant poses to society." *Id.* This reasoning prevents a "false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." *Id.* at 171.

*Simmons*, however, only applies to a capital sentencing scheme that provides for life without the possibility of parole. In *Simmons*, the Supreme Court cautioned that "[i]n a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative[.]" 512 U.S. at 168. For that reason, the *Simmons* Court stated that it will "not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Id.* The *Simmons* Court "expressly held that its ruling did not apply to Texas, because it does not have a life-without-parole alternative to capital punishment." *Tigner v. Cockrell*, 264 F.3d 521, 525 (5th Cir. 2001) (citing *Simmons*, 512 U.S. at 168 n.8).[16]

---

[15] The Supreme Court denied certiorari review on direct appeal. Four justices, however, joined an opinion respecting the denial of certiorari noting the "obvious tension between *Simmons v. South Carolina*, 512 U.S. 154 (1994)" and the "Texas law *prohibit[ing]* the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death." *Brown v. Texas*, 522 U.S. 940 (1997) (Opinion of Stevens, J., respecting denial of certiorari).

[16] In 2005, Texas revised its capital sentencing statute. Capital defendants in Texas state court now face two possible sentences: (1) the death penalty or (2) a sentence of life imprisonment without the possibility of

Texas inmates have offered various arguments in trying to apply *Simmons* to Texas' former capital procedure.  The Supreme Court has not, however, extended the *Simmons* holding beyond "when, assuming the jury fixes the sentence at life, the defendant is ineligible for parole under state law."  *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).  The Fifth Circuit has consistently and unconditionally ruled that *Simmons*' due process holding did not require Texas to inform its juries of a defendant's future parole eligibility.  *See Cantu v. Quarterman*, 341 F. App'x 55, 58 (5th Cir. 2009); *Johnson v. Quarterman*, 294 F. App'x 927, 932 (5th Cir. 2008); *Thacker*, 396 F.3d at 617-18; *Elizade v. Dretke*, 362 F.3d 323, 332-33 (5th Cir. 2004); *Woods v. Cockrell*, 307 F.3d 353, 360-62 (5th Cir. 2002); *Johnson v. Cockrell*, 306 F.3d 249, 256-57 (5th Cir. 2002); *Collier v. Cockrell*, 300 F.3d 577, 583 (5th Cir. 2002); *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001); *Wheat v. Johnson*, 238 F.3d 357, 361-62 (5th Cir. 2001); *Miller v. Johnson*, 200 F.3d 274, 290-91 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 617 (5th Cir. 1999); *Muniz v. Johnson*, 132 F.3d 214, 224 (5th Cir. 1998); *Montoya v. Scott*, 65 F.3d 405, 416 (5th Cir. 1995); *Allridge v. Scott*, 41 F.3d 213, 222 (5th Cir. 1994); *Kinnamon v. Scott*, 40 F.3d 731, 733 (5th Cir. 1994).  The Fifth Circuit has also rejected the other constitutional theories upon which Brown relies, to wit: the Cruel and Unusual Punishment Clause, *Nealy v. Dretke*, 172 F. App'x 593, 597 (5th Cir. 2006); *Thacker*, 396 F.3d at 617; *Rudd*, 256 F.3d at 320-21; and the Equal Protection Clause, *Tigner*, 264 F.3d at 525-26; *Collier*, 300 F.3d at 585-86; *Green v. Johnson*, 160 F.3d 1029, 1044 (5th Cir. 1998).

Brown concedes that settled legal precedent has routinely denied relief on similar claims, but "retains this issue in order to preserve it for further possible appellate review."  (Instrument No. 28 at 117-18).  Because Brown has not shown that the state court's rejection of these claims

parole.  Tex. Code Crim. Pro. art. 37.071 § 2(g).  *Simmons*' application to the new statute is not before the Court.

was contrary to, or an unreasonable application of, federal law, the Court denies relief.  *See* 28 U.S.C. § 2254(d)(1).

### III.     Knowing Presentation of False Testimony (claims 8 and 9)

Brown raises two claims accusing the State of knowingly presenting false testimony at trial from a forensic examiner (claim eight) and from his sister, Carolyn Momoh (claim nine).  In asserting that the prosecution misrepresented the evidence, Brown primarily relies on *Napue v. Illinois*, 360 U.S. 264 (1959).  *See United States v. Wall*, 389 F.3d 457, 472 (5th Cir. 2004) ("The knowing use of false testimony is commonly referred to as a *Napue* violation after the Supreme Court's opinion in *Napue v. Illinois*[.]").  In *Napue*, the Supreme Court explained that the prohibition against false testimony is "implicit in any concept of ordered liberty."  *Napue*, 360 U.S. at 269.  "In order to establish a *Napue* violation, the defendant must show (1) the statements in question are actually false; (2) the prosecution knew that the statements were false; and (3) the statements were material."  *United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998).  The Court finds that Brown's false-testimony claims are without merit.

#### A.     Ballistics Evidence

The prosecution presented ballistics evidence to tie together two important pieces of evidence: (1) Rachel Tovar's testimony that she saw Brown with a .38 revolver and (2) testimony from Brown's sister Carolyn Momoh that she owned a Charter Arms .38 caliber gun that was discovered missing from her home in Houston after Brown's last visit.  The police obtained two pistols in Alabama that they linked to this case: a Charter Arms .38 and a Smith & Wesson .357.  Charles Anderson, a ballistics expert from the Houston Police Department Crime Laboratory, explained that he had compared bullets recovered from the victims with those he test fired from the two weapons.  Mr. Anderson testified that the two recovered weapons had fired

several of the bullets found at the crime scene.  Specifically, Mr. Anderson explained that "four of the bullets recovered from the complainant's bodies were fired from the same .38 Charter Arms gun."  State Habeas Record at 289.

Brown requested discovery of the bullet slugs in state habeas court.  The trial court and Court of Criminal Appeals denied his request for the Harris County Sherriff's Department to turn over the ballistics evidence for retesting.  After challenging Mr. Anderson's testimony on state habeas review, Brown now argues that he "has a good faith belief that the testimony by Houston Police Department ballistics examiner Anderson is materially false and misleading and that he has a sufficient basis to seek an independent ballistic examination."  (Instrument No. 1 at 63).

As evidence of the falsity of the trial testimony and as a reason to conduct discovery, Brown points to "scandals occurring within the Houston Police Department crime lab.  These identified problems include problematic ballistic examinations, including examinations conducted by Anderson himself."  (Instrument No. 1 at 64).  Respondent does not dispute that the HPD crime lab has made mistakes in other cases.  Respondent, however, argues that Brown has not brought forth anything specifically questioning the testing done in this case.

The state habeas court found that Brown's "beliefs concerning the ballistics evidence are wholly speculative."  State Habeas Record at 290.  This Court denied Brown's initial request for discovery because he has not adduced any particularized evidence showing that the HPD Crime Lab made mistakes in testing the forensic evidence.  (Instrument No. 16).  His more-recent briefing has not made a stronger showing of error.

Even if testing were to show that the ballistic evidence from trial was wrong, the state habeas court found three reasons to deny his claim nonetheless.  First, the state habeas court held that "[a]ssuming arguendo that ballistics re-testing yielded a different result, [Brown] fails to

show Anderson's testimony was false, as opposed to different experts reaching different conclusions[.]"  State Habeas Record at 300.  Second, the state habeas court found that Brown had not shown that "the State *knowingly* presented false testimony[.]"  State Habeas Record at 300 (emphasis added).  Brown must not only show that the trial testimony was wrong, he must prove that the State knew it was false.  Nothing in the record suggests that the State intentionally adduced false evidence.

Finally, and most importantly, the state habeas court found that Brown had not shown that

> a different result would have been reached in [Brown's] trial in light of the evidence as a whole. [Brown] fails to show harm from the trial court's denial of [Brown's] motion to obtain and re-test the firearms evidence, in light of direct evidence of [Brown's] involvement in the shooting, the lack of evidence as to whether all the weapons used in the offense were recovered, the fact that other people participated in the offense with [Brown], the 'parties' charge given to [Brown's] jury at guilt-innocence, and the punishment special issue asking the jury to determine whether [Brown] actually caused the deaths of the complainants, or if he did not actually cause their deaths, whether he intended to kill, or that he anticipated that a human life would be taken.

State Habeas Record at 300-01.  Even without the evidence connecting Brown to that particular weapon, the trial testimony amply confirmed his role in the crime.  True, one victim pointed to Brown's co-defendant as a shooter, but the police were never able to identify who fired all of the shots.  Testimony from three individuals – including a surviving victim who saw Brown hold a pistol to the head of another – confirmed that Brown was a major participant in the robbery/murders.  There was no serious question about Brown's identity as a party to the offense.  Given the law-of-the-parties instruction, the evidence amply allowed for Brown's conviction without linking him to the recovered firearms.  Eyewitness testimony confirmed that Brown intended that the victims be killed.  Proving the ballistics testimony false would not measurably alter the jury's consideration of Brown's role in the murder.

Given the speculative nature of Brown's claim and the conclusive evidence against him, the state habeas court's rejection of this *Napue* claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

B.      Testimony from Brown's Sister

Brown's second false-testimony claim comes from the State's interaction with his sister, Carolyn Momoh.  On direct appeal, the Court of Criminal Appeals outlined the background of her testimony:

> The State sought to call [Ms. Momoh] as a witness during its case-in-chief. George Parnham, [Ms. Momoh's] attorney, objected to the witness taking the oath, suggesting that if her trial testimony was inconsistent with her prior written statement she gave to Houston Police she would be subject to prosecution for aggravated perjury. [Ms. Momoh] eventually agreed to take the oath and was sworn as a witness. She refused to testify, however, and asserted her Fifth Amendment privilege. The trial court found that [Ms. Momoh] did not have a valid Fifth Amendment privilege and ordered her to testify. She continued to refuse to testify and the trial court found her in contempt of court and ordered her confined in the Harris County jail. Upon a Motion for Leave to File an Application for Writ of Habeas Corpus to this Court, we ordered [Ms. Momoh] released on posting of a personal bond. We later denied [Ms. Momoh's] Motion for Leave to File and she was again incarcerated in the Harris County jail. The State called [Ms. Momoh] once more and she finally agreed to testify.
>
> The State first called [Ms. Momoh] outside the presence of the jury, at which time her testimony was consistent with her prior written statement. Because [Ms. Momoh's] testimony outside the jury's presence was consistent with her statement, the State decided to call her as a witness in front of the jury. [Ms. Momoh's] testimony was again consistent with her prior written statement. On cross-examination by the defense, however, the witness testified inconsistently with her prior written statement and her direct examination testimony. [Ms. Momoh] stated that she lied to the police about [Brown] admitting that he committed the offense and that she made up statements to that effect.

Opinion on Direct Appeal at 36.

As described above, Ms. Momoh initially testified in a manner consistent with her police statement, but reversed herself on cross-examination.  More specifically, the Court of Criminal Appeals noted that Ms. Momoh claimed that the police coerced her statement:

Carolyn Momoh testified on direct examination that [Brown] confessed to her his involvement in the offense, but recanted that testimony on cross-examination. On direct examination [Ms. Momoh] testified that when she took [Brown] to the airport on the morning of June 21st he confessed to having killed six people. This was consistent with what she told the Houston police on June 26th. On cross-examination, [Ms. Momoh] testified that she was threatened and cursed at by the Houston police in the course of giving her June 26th statement. She said she was told that she could not leave until she "got it right." She was told there was a pending federal warrant for her arrest. She stated she would not have testified consistent with her June 26th statement if she had not been threatened with contempt and six months in jail and/or a charge of aggravated perjury. She then testified to "inaccuracies" in her June 26th statement that she claimed were made due to the alleged threats:

> Q.   Did you change any of your statements that you told the police, did you change them and put something different, allow something different to be put in the written statement because of the threats and coercion?
>
> A.   Yes.
>
> ***
>
> Q.   . . . Was it accurate or not accurate that [Brown] actually said anything to you about having shot anyone?
>
> A.    That's inaccurate.
>
> Q.   . . . Was that something that the police wanted you to get right?
>
> A.   That was one of the things, yes.
>
> * * *
>
> Q.   Do you believe that your brother did this?
>
> A.    No.
>
> Q.   And did your brother ever tell you that he did it?
>
> A.   No.

Opinion on Direct Appeal at 36-37, n.19.   After trial the State charged Ms. Momoh with aggravated perjury, alleging that one of her statements at trial was false.  Ms. Momoh pleaded

guilty and received a sentence of misdemeanor adjudication probation.

Brown argues that the State presented false evidence through Ms. Momoh's direct testimony. Ms. Milstein's statement alleges that Ms. Momoh said that she told the truth on cross-examination. Also, Ms. Momoh allegedly claimed that the police coerced her and fabricated her statement. Ms. Momoh's sisters allegedly confirmed this information. Brown also argues that the prosecution "improper[ly] manipulate[ed] . . . state evidentiary rules" by calling Ms. Momoh as a witness "for the express purpose of impeaching her recantation[.]" (Instrument No. 1 at 82). He asserts that the prosecution violated his due process rights by coercing her testimony. None of Brown's allegations relating to Ms. Momoh's testimony have merit.

On direct appeal, the Court of Criminal Appeals observed that "[t]he State repeatedly indicated that it had no reason to disbelieve the truth of [Ms. Momoh's] statement to police, especially since [Ms. Momoh] reiterated the truth of her statement to the prosecutors prior to trial. [Brown] concedes there is nothing in the record to suggest that the State believed [Ms. Momoh's] statement to the police was untruthful." Opinion on Direct Appeal at 39; *see also* State Habeas Record at 299-300, 305. Brown has not made any convincing showing on federal review that Ms. Momoh testified falsely in her direct testimony rather than on cross-examination, much less that the Government knew she would lie. *See Kutnzer v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) ("Conflicting or inconsistent testimony is insufficient to establish perjury."); *United States v. Holladay*, 566 F.2d 1018, 1019 (5th Cir.1978) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury."). Contradictory trial testimony under such circumstances establishes a credibility question for the jury. *See Kutzner*, 242 F.3d at 609 (5th Cir. 2001); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir.

1990); *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988).  The state courts were not unreasonable in denying Brown's *Napue* claim based on his sister's testimony.

Brown also seeks federal habeas relief because the State coerced Ms. Momoh into testifying against him.  Relying on *Webb v. Texas*, 409 U.S. 95 (1972), and similar cases, Brown alleges that the prosecution and trial court's interaction with Ms. Momoh intimidated her and interfered with his right to present a complete defense.  To succeed, Brown must show that "the government's conduct interfered substantially with [Ms. Momoh's] 'free and unhampered choice' to testify."  *United States v. Thompson*, 130 F.3d 676, 686 (5th Cir. 1997) (quotations omitted).  Nevertheless, a prosecutor does not trample on that right by informing a witness, through counsel, about the consequences of perjury.  "A prosecutor is always entitled to attempt to avert perjury and to punish criminal conduct." *United States v. Viera*, 839 F.2d 1113, 1115 (5th Cir. 1988).  Simply, "[t]here is nothing wrong with the government informing witnesses of the consequences of breaking the law."  *Thompson*, 130 F.3d at 687 (quotation omitted).

Here, the state courts found that the prosecution did not improperly force Ms. Momoh to testify:

> All the discussions surrounding [Ms. Momoh's] testimony took place in the courtroom with both parties and the trial judge present. The witness' attorney, and not the State, brought up the subject of perjury and contempt when it asked the court what would happen if [Ms. Momoh] refused to take the oath and to testify. The State repeatedly indicated that it had no reason to disbelieve the truth of [Ms. Momoh's] statement to police, especially since [Ms. Momoh] reiterated the truth of her statement to the prosecutors prior to trial. [Brown] concedes there is nothing in the record to suggest that the State believed [Ms. Momoh's] statement to the police was untruthful. The State acknowledged that if [Ms. Momoh's] trial testimony differed from her prior statement to police, she would be subject to perjury charges. The State also made it clear that if the witness was held in contempt for refusing to testify, the trial court was going to have to determine the appropriate punishment, not the State. [Brown] does not cite to any part of the statement of facts where the State made threatening or coercive comments which could be said to have intimidated [Ms. Momoh] into testifying consistent with her statement to police. Perhaps more importantly, [Ms. Momoh] refused to testify

> despite the trial court's admonishments and the State's comments concerning perjury and contempt.
>
> [Brown] has not demonstrated any misconduct or coercion on the part of the State, and as such, the trial court did not err in overruling [Brown's] motion for mistrial.

Opinion on Direct Appeal at 35-40.  As described by the summary above, this case is unlike *Webb*, in which a judge used "unnecessarily strong terms (that could) have exerted such duress on the witness's mind as to preclude him from making a free and voluntary choice whether or not to testify."  409 U.S. at 98.  In *Webb*, the trial judge spoke directly to the witness at trial and stated that "[i]f you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on."  *Id*. at 96.  Unlike in *Webb*, neither the court nor the prosecution gave a personal guarantee of indictment and conviction.  Brown has not shown that the prosecution improperly coerced Ms. Momoh's testimony.[17]

In the end, the state habeas court found any error harmless.  The harmless inquiry focuses on whether the purported constitutional violation influenced the jury's verdict.  *See Knotts v. Quarterman*, 253 F. App'x 376, 382 (5th Cir. 2007).  As observed by the state court, "[a]ssuming *arguendo* that Momoh's testimony contained falsehood, unbeknownst to the State, [Brown] fails to show harm based on trial counsel's eliciting testimony during cross-examination concerning alleged contradictions between Ms. Momoh's statement and her trial testimony."  State Habeas Record at 305.  Given the whole inculpatory picture put before the jury, and particularly that testimony coming from eyewitnesses about Brown's active participation in the crime, the state

---

[17]     To the extent that Brown alleges that police misconduct coerced Ms. Momoh into making her police statement, only Ms. Milstein's hearsay account supports that theory.  Brown has not adduced any competent evidence to support his allegations of police overreaching.

courts reasonably found that any error would be harmless.

The Court denies Brown's eighth and ninth claims.

## CERTIFICATE OF APPEALABILITY

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED.R.APP.P. Rule 22(b).  Brown has not sought a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*.  *See Alexander*, 211 F.3d at 898.  The Court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.

A COA may issue when "[a petitioner] has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Settled precedent forecloses relief on Brown's claims.  Because Brown has not shown under the appropriate standard that any claim needs appellate review, this Court will not certify any issue for consideration by the Fifth Circuit.

## CONCLUSION

Brown has not met the high standards required for federal habeas corpus relief.  The Court **GRANTS** Respondent's motion for summary judgment and **DENIES** Brown's petition for a writ of habeas corpus.  The Court also **DENIES** Brown's request for additional factual development.  (Instrument No. 28).  The Court will not issue a Certificate of Appealability.

SIGNED at Houston, Texas, this 28th day of February, 2011.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE